## BLUMENTHAL *v.* UNITED STATES.

NO. 54.

Argued October 23, 1947.—Decided December 22, 1947.

540

*Arthur B. Dunne* argued the cause for petitioners in Nos. 54, 55 and 57. With him on a brief filed for petitioner in No. 55 was *Walter H. Duane.*

*Samuel S. Weiss,* petitioner in No. 56, argued the cause and filed a brief *pro se.*

*Hugh K. McKevitt* filed a brief for petitioner in No. 54.

*Leo R. Friedman* filed a brief for petitioner in No. 57.

*Beatrice Rosenberg* argued the cause for the United States. With her on the brief were *Solicitor General Perlman* and *Robert S. Erdahl.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The four petitioners and Abel, another defendant, were convicted of conspiring to sell whiskey at prices above the ceiling set by regulations of the Office of Price Administration, in violation of the Emergency Price Control Act. 50 U. S. C. §§ 902 (a), 904 (a) and 925 (b). The charge was made pursuant to the general conspiracy statute, § 37 of the Criminal Code. The convictions were affirmed by the Circuit Court of Appeals, one judge dissenting. 158 F. 2d 883, dissenting opinion at 158 F. 2d 762. Abel has not sought review in this Court. Certiorari was granted as to the other four defendants because we thought important questions were presented concerning the applicability of our recent decision in *Kotteakos* v. *United States,* 328 U. S. 750.

We did not limit our grant of certiorari to that question, however, and on the record it is inseparably connected with the other issues, which relate to the admissibility and sufficiency of the evidence. Accordingly we have considered all of petitioners' contentions. The com-

petent proof was clearly sufficient to show that each petitioner had aided in the whiskey's illegal sale and had conspired with others to do so. The only phase of the case meriting further attention is whether, because of a difference in the state of the proof affecting two groups of defendants, the proof, in variance from the indictment, shows that there was more than one conspiracy.

I.

The indictment charges a single conspiracy in a single count. Ten overt acts are specified. The Government alleged and sought to establish that all of the defendants and other unidentified persons conspired together to dispose of two carloads, each consisting of about 2,000 cases, of Old Mr. Boston Rocking Chair Whiskey at over the ceiling wholesale prices.

This whiskey was shipped by rail from the distiller or his agent to the Francisco Distributing Company, in San Francisco, in December, 1943. Goldsmith was the individual and sole owner of that business and held a wholesale liquor dealer's basic permit as required by federal law. Weiss, his former partner, was sales manager for the business. Feigenbaum operated the Sunset Drugstore in San Francisco. Blumenthal owned and operated the Sportorium, a sporting goods and pawn shop in the same city. Abel either owned or worked in a jewelry store in Vallejo, California. The evidence does not show that any of these last three was connected with Francisco in any way except that each had part in arranging sales and deliveries of portions of these two shipments to purchasers. These were tavern owners in San Francisco and near-by towns such as Vallejo, Santa Rosa, Livermore, Cottonwood and El Cerrito. Proof of the activities of Feigenbaum, Blumenthal and Abel was made largely by

the testimony of the various tavernkeepers with whom they respectively dealt.

The evidence showed that on arrival of the whiskey in San Francisco legal title was taken in Francisco's name, in which the shipping documents were made out; that it honored sight drafts for both shipments, upon Goldsmith's directions to Francisco's bank to pay them out of Francisco's account; that some of the whiskey was delivered *ex car* directly to tavernkeepers who previously had arranged for purchases in lots varying from 25 to 200 cases; that the remainder was placed in storage with the San Francisco Warehouse Company, pursuant to arrangements made by Weiss, and thereafter was delivered by the warehouse to various purchasers holding invoices issued by Francisco [1] on orders given by Weiss. The *ex car* deliveries also were made pursuant to similar invoices and orders.

It further appeared that the cost of the whiskey to Francisco was $21.97 a case,[2] the wholesale ceiling price was $25.27, and Francisco received, by check of the purchasing tavernkeepers, $24.50 for each case sold. There was thus left to it a margin above cost of $2.53 on each case, out of which were to come storage charges, if any, and legitimate net profit.

Thus far no illegal act, transaction, intent or agreement appears. But by the testimony of purchasing tavernkeepers the Government proved that in connection with each sale the purchaser had paid to the selling intermediary, in addition to the $24.50 per case remitted

---

[1] Of the more than 4,000 cases received by Francisco, proof concerning disposition at over-ceiling prices related to less than half, or some 1,500-plus cases.

[2] Consisting of $19.24 per case to the distiller, 81¢ for freight, and $1.92 for state taxes.

by check to Francisco, an additional sum in cash amounting roughly to from $30 to $40 per case. Thus the actual cost to the retailer was from $55 to $65 per case.

In some instances the identity of the person arranging the transaction for the seller and receiving the cash payment was not established or known to the witness testifying to the sale and its details. In others, however, Blumenthal, Feigenbaum or Abel was identified as the salesman or intermediary. It was not brought out with what person or persons Abel, Feigenbaum, Blumenthal or the other salesmen dealt in securing the whiskey from Francisco.[3] In two sales, Figone, a tavernkeeper of El Cerrito, testified he arranged for the purchases in Francisco's offices, but could not identify the person with whom he dealt.

In all instances, however, whether involving sales to San Francisco or to out-of-town dealers and whether through identified or unidentified selling intermediaries, the sales followed the general pattern described above. That is, once the understanding had been reached, the purchaser made out his check at the price of $24.50 per case, to the order of "Francisco Distributing Co.," at the direction of the selling intermediary, to whom the check was delivered; at the same time or later the purchaser

[3] The witnesses identifying Feigenbaum testified they sought him out at the Sunset Drugstore in San Francisco and made the arrangements with him for their purchases there. Similar testimony was given by those identifying Blumenthal with the arrangements taking place in the Sportorium.

In some instances the out-of-town purchasing witnesses testified that they went to San Francisco in search of whiskey to buy and by one means or another, usually through inquiry of persons frequenting bars where the witnesses stopped, were directed to the selling agent. In other instances the intermediary sought out the tavernkeeper as a prospective purchaser at his place of business.

also paid in cash to the intermediary the difference between the amount of the check and the agreed over-ceiling purchase price; then or later the purchaser received invoices in the name of Francisco for the number of cases of Old Mr. Boston Rocking Chair Whiskey bought, showing only the legal price of $24.50 per case; and thereafter the purchaser received delivery of the whiskey from the warehouse company, by freight in the case of out-of-town buyers. Weiss gave the warehouse company instructions for shipments or local deliveries. Francisco collected the checks by endorsing and sending them through its bank for collection. Slight variations in detail of the pattern appear in some instances but they are insignificant for our purposes.

The foregoing is substantially the evidence used, not only in part to show the conspiracy, but also to connect Blumenthal, Feigenbaum and Abel with it. In addition to the evidence already related as it affects Goldsmith and Weiss, the court received as to them alone the testimony of Harkins, a special investigator for the Alcohol Tax Unit of the Treasury Department. He related conversations had with Goldsmith and Weiss, during which important admissions were made by one or the other or both. Those admissions give rise to the crucial problems in the case.

At the initial conference "early in January," 1944, attended by both Goldsmith and Weiss, the latter "did most of the talking." Questioned concerning who purchased the two carloads and how they were handled, Weiss said "that his firm received $2.00 a case for clearing it through their books." Goldsmith concurred in this and both stated that they divided the $2.00, each taking a dollar. "They both stated, agreed, that they did not sell any of the whiskey. It was sold by others, and they received

the check generally for the payment of [for] the whiskey in advance of the date that they had to take up the sight draft bills of lading. At that time they did not tell us who actually sold the whiskey."

Later conferences held separately with Goldsmith and Weiss simply confirmed the substance of the first to the effect that Francisco was not the actual owner, but that Goldsmith and Weiss were acting for an unidentified person in handling the shipments in Francisco's name.[4] The identity of the owner was not established. But Goldsmith added the admission that he wrote most of the invoices.

Shortly after the trial began the court announced that it would save time and be fairer to all for the evidence to be received initially only as against the particular defendant or defendants to whom it appeared expressly related, reserving to the Government, however, the right to move for its admission as against any or all of the other defendants whenever in the Government's opinion

---

[4] At an interview with Goldsmith "early in September," Goldsmith was asked "who actually bought him the whiskey, who owned it." In reply "he said that Blumenthal brought it in, and when asked if he knew of his own knowledge, he said, 'No.'" He again stated that Francisco received $2 per case, of which he gave Weiss half.

A still further questioning of Goldsmith took place on September 13. Harkins showed Goldsmith several invoices given to purchasers in the name of Francisco. Goldsmith admitted that he wrote most of the invoices and identified his own handwriting, stating however that a few were written by his bookkeeper.

Harkins testified also regarding a conversation with Weiss on May 14, 1944. In this Weiss stated "it was true that he received half of the $2 commission paid to the Francisco Distributing Company for clearing this whiskey through their books, and he finally refused to answer who actually owned the whiskey. He said 'I don't want to involve myself.'" Weiss also admitted knowing Blumenthal, but "refused to state, to the best of my [the witness'] recollection, positively, whether Mr. Blumenthal was the owner of the whiskey or not."

sufficient facts had been introduced to show such de-
fendants to have been connected with the conspiracy
charged.

This course was followed. At the close of the Govern-
ment's case, the court granted its motion to admit all
of the evidence as against all of the defendants, except
that it declined to allow Harkins' testimony concerning
his conversations with Goldsmith and Weiss to be admit-
ted as against the defendants Blumenthal, Feigenbaum
and Abel. That testimony however was allowed to stand
against both Goldsmith and Weiss insofar as it related
the conversation had in the presence of both, and as to
each of them respectively to the extent that the other
interviews took place in his presence.

The court overruled numerous objections to these rul-
ings by each defendant. None offered evidence in his
own behalf.

Following its rulings on admissibility, the trial court
concluded as against various objections that the evidence
was sufficient to go to the jury on the issues whether the
conspiracy charged had been made out and concerning
each defendant's connection with it. Accordingly, it over-
ruled the defendants' motions for directed verdicts and
submitted the case to the jury. In the instructions the
court expressly stated, in accordance with the previous
rulings on admissibility, that Harkins' testimony was to
be considered only as against Goldsmith and Weiss, not
as against the other three defendants.

## II.

In the *Kotteakos* case, *supra,* the Government conceded
that, under the charge of a single, all-inclusive con-
spiracy, the proof showed distinct and separate ones
connected only by the fact that one man, Brown, was
a participant and key figure in all. But it urged that

under the ruling in *Berger* v. *United States,* 295 U. S. 78, the variance was at the most harmless error, a contention we rejected. Here the situation is the reverse. The Government has conceded, in effect, that prejudice has resulted if more than one conspiracy has been proved.[5] But it insists that the evidence establishes a single conspiracy and no more, an issue not presented or determined in the *Kotteakos* case.

The proof, in relation to whether one or more conspiracies were shown as well as relative to whether any was made out, requires somewhat different treatment concerning the two groups of defendants, Weiss and Goldsmith, on the one hand, and Blumenthal, Feigenbaum and Abel, on the other. This is by reason of the court's exclusion of the admissions of Goldsmith and Weiss from consideration as to the other three defendants.

The Government does not maintain that Francisco, or Goldsmith (or therefore Weiss), was the owner of the whiskey. It accepts the view that another or others, unidentified, were the real owner or owners and that Francisco (and thus Goldsmith and Weiss) was merely a channel for distributing the liquor and giving that unlawful process a legal façade. Indeed the "innocent appearing actions" of Weiss and Goldsmith in their use of Francisco, the brief asserts, "were the crux of the conspiracy . . . since the color of legitimacy was an essential part of the plan to dispose of the liquor to tavern owners at over-ceiling prices." [6]

---

[5] The brief states: "The Government does not contend that if the proof showed several conspiracies, as the dissenting judge thought, the variance would not be prejudicial."

[6] The brief also declares that "the gist of the conspiracy . . . was the scheme to sell liquor to tavern owners at over-ceiling prices in an apparently legitimate fashion through the medium of Francisco."

The plan, it is said, "was not merely to sell liquor at over-ceiling prices; it was a plan to sell liquor at over-ceiling prices in an appar-

The evidence including the admissions was clearly sufficient to establish that the owner devised a plan which contemplated the entire chain of events from the original purchase in Francisco's name to the ultimate black market sales and deliveries. This includes the obvious inference that he made the arrangements for clearance through Francisco's books. Since Goldsmith and Weiss were the owner and sales manager respectively of Francisco and had active parts personally in carrying out those arrangements, there hardly can be any question that they knew the owner, had part in making the arrangements with him and, by virtue of those facts and their parts in facilitating the sales and deliveries to the tavernkeepers, knew also of his intention to resell the whiskey and of his plan for doing so in every material respect except that he intended to sell at over-ceiling prices.

The showing on that crucial question was entirely circumstantial. It was nonetheless substantial. Goldsmith and Weiss knew that there was a margin of only about 77¢ between the legal price ceiling and the $24.50 per case they received by check in payment for the whiskey.[7] They knew that the invoices sent by Francisco to each purchaser gave no room for even that slender margin but

---

ently legitimate fashion" and "the core of the scheme was the arrangement by which the whiskey would clear to tavern owners through Francisco, a legitimate wholesaler."

[7] The $24.50 price was at the most 53¢ above the actual cost of the whiskey, see note 2, plus the $2.00 fee paid Francisco for the use of its books. There is no evidence that the unknown owner received any portion of this 53¢ margin. Since the record shows that Francisco was billed by the warehouse company for the storage of the liquor, the inference was fully justified that the 53¢ margin was largely dissipated by the storage charges and other overhead costs attributable to the sale of the whiskey and that the remaining sum, if any, was retained by Francisco.

represented only the owner's cost figure. They knew further that by using Francisco's name, services and facilities the owner was concealing his identity from the purchasers in the sales, making Francisco appear as the owner on the paper records; that sales were being made to numerous and widely scattered tavernkeepers; and that in every sale remittance was made to them uniformly not only by check, usually of the purchaser, but also in the exact amount of $24.50 per case.

The inference that the unknown owner was giving away the liquor is scarcely conceivable. The most likely inferences to be drawn were two, namely, that the owner was selling for a legal margin of not more than 77¢ or that he was selling at over-ceiling prices. The first inference is hardly tenable, especially in view of the prevailing and widespread shortage and demand, with accompanying black market activity, of which the most meticulous wholesale liquor dealer hardly could have been ignorant. The inference was not only justified, it was almost inescapable, that Goldsmith and Weiss knew of the owner's intent and purpose to sell above the lawful price, as well as most of the detail of his plan for doing so. With that knowledge their active aid toward executing his design made them co-conspirators with him, and he with them, toward accomplishing it.

## III.

It remains however to consider whether, without the admissions, Blumenthal, Feigenbaum and Abel have been shown to have conspired together and with Goldsmith and Weiss in the scheme proved against the latter two.

The admissions alone disclosed the unknown owner's existence; that Goldsmith and Weiss were acting for him, not for themselves; received from the transactions, and divided equally, the $2 per case; and gave the use of

Francisco's name to cover up the unknown owner's existence, identity and part in the scheme.

Whether or not the evidence stripped of those facts was sufficient to sustain the charge, a preliminary question arises upon the trial court's disposition of the admissions. They supplied strong confirmatory or supplementing proof to show, not only the connections of Goldsmith and Weiss with the scheme, but also its existence and illegal character. If therefore it were shown, or even were doubtful, that the admissions had been improperly received as against Blumenthal, Feigenbaum and Abel, reversal would be required as to them.[8]

But the trial court's rulings, both upon admissibility [9] and in the instructions,[10] leave no room for doubt that the

[8] Even if the evidence were sufficient with the admissions excluded, they were of such importance that if admitted improperly the jury might have drawn entirely different inferences from the whole evidence including them than from it without them.

[9] Before sending the case to the jury the court stated in its presence and for its benefit that it had granted the Government's motion to admit all the evidence against all the defendants except: "That the testimony of the last witness, Mr. Harkins, is admitted in evidence as against the defendant Goldsmith as to the conversation had by the witness with the defendant Goldsmith; that his testimony is admitted as to the defendant Weiss with respect to conversations with the defendant Weiss; and as to both defendants, Goldsmith and Weiss, as to all conversations at which both defendants, Goldsmith and Weiss, were present, and exceptions are noted as to this ruling on behalf of all the defendants separately." The court then added, on inquiry, that counsel was right in taking this to mean that the Harkins testimony "does not affect the defendants Blumenthal and the other two or three."

[10] At three distinct places the court made references either generally and abstractly or expressly applicable to the admissions.

In the first, after stating that the testimony of an accomplice or co-conspirator and oral admissions of a defendant must be received with caution, the court said: "In this case . . . proof of the conspiracy charged . . . must be made independent of admissions of

admissions were adequately excluded, insofar as this could be done in a joint trial, from consideration on the question of their guilt. The rulings told the jury plainly to disregard the admissions entirely, in every phase of the case, in determining that question.[11] The

any defendant made after the termination of the alleged conspiracy." At a later point the jury was told: ". . . you must disregard entirely any testimony stricken out by the Court, or any testimony to which an objection has been sustained. . . . *Testimony which has been admitted only to apply as to a specified defendant may only be considered by you as to that defendant and none other.*" (Emphasis added.) And finally near the end of the instructions, expressly referring to the admissions of Goldsmith and Weiss, the court said: "Where the existence of a criminal conspiracy has been shown, every act or declaration of each member of such conspiracy, done or made thereafter pursuant to the concerted plan and in furtherance of the common object, is considered the act and declaration of all the conspirators, and is evidence against each of them. On the other hand, after a conspiracy has come to an end, either by the accomplishment of the common design, or by the parties abandoning the same, evidence of acts or declarations thereafter made by any of the conspirators can be considered only as against the person doing such acts or making such statements.

"*In that connection,* you will recall that I advised you during the trial of the case that the statements made by the defendants Goldsmith and Weiss to the witness Harkins could only be considered by you as against those two named defendants." (Emphasis added.)

[11] It is not entirely clear whether the words "In that connection," italicized in the last paragraph of note 10, refer only to the last or to both of the preceding sentences, in the specific context of the two paragraphs last quoted. But when those statements are taken in conjunction with the earlier ones and with the court's rulings on admissibility made in the jury's presence, we think the total effect of the instructions was to tell the jury plainly to disregard the admissions entirely in considering the guilt of Blumenthal, Feigenbaum and Abel.

This view, though apparently differing from the Government's, see note 12, is reinforced by the further instruction, immediately following the one last quoted in note 10, to the effect that admissions of a

direction was a total exclusion, not simply a partial one as the Government's argument seems to imply.[12] The court might have been more emphatic. But we cannot say its unambiguous direction was inadequate. Nor can we assume that the jury misunderstood or disobeyed it.

With the admissions thus entirely excluded, we think nevertheless that the remaining evidence was sufficient to show, in accordance with the charge, that the five defendants joined in a single conspiracy to sell the whiskey at over-ceiling prices in the guise of legal sales. We set forth in the margin the remaining evidence, in part, which justifies this conclusion both as to Goldsmith and Weiss [13] and as to the other three defendants.[14]

---

conspirator not made in execution of the common design are not evidence against any of the parties other than the one making them. The admissions here fell clearly in that category, some of them because made after termination of the conspiracy, others because they had no effect to forward its object. None were made in furtherance of the conspiracy's object. Cf. *Fiswick* v. *United States*, 329 U. S. 211.

[12] Although we are not sure the argument goes so far, it seems to urge, see note 6 and text, that the admissions, as well as the other evidence expressly affecting only one or some of the defendants, were admissible and were received, not merely as against Weiss and Goldsmith on the whole case but also in part as against the other three, that is, to show even as to them the existence and illegal character of the scheme, though not to establish their connections with it. We do not read the record as showing this was the effect of the trial court's ruling.

[13] The evidence as to the unknown owner no longer being in the picture, the inference is almost irresistible that Francisco was the owner. On arrival of the whiskey, title was taken in Francisco's name, in which the shipping documents were made out; sight drafts for the two carloads were paid, at Goldsmith's direction, from Francisco's bank account; and the whiskey was stored and delivered by the warehouse company in accordance with Weiss' directions.

At a time when wholesale liquor distributors were hard put to supply even long-established customers, Francisco sold its liquor, through the medium of salesmen who had no previous connection

The main difference comes with the elimination of the unknown owner from view, and Francisco's consequent appearance as both actual and legal owner. This changes the detail of the façade, but does not remove either the

---

with the firm and were not regularly engaged in the business of selling liquor, to various tavern owners who had not previously had dealings with Francisco. Moreover, the sales were billed at a price 77¢ per case below the OPA ceiling, despite the fact that tavern owners and other retail distributors considered themselves fortunate to secure whiskey at the full ceiling price. Also of interest are tavern owner Figone's over-ceiling purchases, which followed the pattern of the other sales, except in the important respect that they were made at the Francisco office, but with a person Figone could not identify. See text *supra* following note 3.

We are not prepared to say that the jury was not justified in inferring from this evidence that Goldsmith and Weiss, the guiding hands of Francisco, were willing to make the sales only because of an illegal agreement with the salesmen to receive over-ceiling prices.

The case would stand little better for Goldsmith and Weiss upon an inference that they sold to some other person, who in turn resold to the tavernkeepers through the salesmen. For then the 77¢ legal margin would remain, now for the intervening purchaser, together with the use of Francisco's books and records to conceal his existence and part in the transactions and the allowable inferences from those facts.

[14] Acting almost simultaneously in early December before the first carload arrived in San Francisco, Blumenthal and Feigenbaum, as well as Abel and other unidentified salesmen, made it known that they could obtain whiskey for tavernkeepers. There are compelling indications that these salesmen were kept informed of the status of the whiskey. Thus, on the 8th or 9th of December, Feigenbaum told one purchaser that the whiskey would arrive in San Francisco in "about a week or ten days," that it would come in by railroad, and that there would be "a carload of it." The first of the two carloads of liquor actually arrived on December 17. Similarly, on the 3d or 4th of December, Blumenthal told tavernkeeper Fingerhut that the whiskey would arrive in the latter part of the month. The whiskey did so arrive and the purchaser received delivery. Then, late in December, Fingerhut received a telephone call, which he said was from Blumenthal, asking whether he needed more whiskey. As

façade itself or the essence of the unlawful scheme.   That still was to sell the whiskey illegally in the guise of legal sales,[15] to the knowledge of each defendant.[16]   The gist of the conspiracy lay not in who actually owned the

a result, Fingerhut made an additional purchase on January 3 or 4, 1944.   The second carload was received by the warehouse company on or about January 3d.

In addition to being well informed as to the progress of the whiskey in its journey westward, the salesmen followed a singularly set pattern in making their respective sales.   All knew and so told the prospective customer that he would receive Francisco's invoice for the whiskey at the same below-ceiling price, which invoice was of great importance because it enabled the tavernkeepers to comply with the record-keeping requirements imposed by the California law.   See note 15.   All made arrangements for the payment of the identical price of $24.50 per case to Francisco by check.   All received the checks, which were delivered to Francisco and collected by it.

Of some significance, in connection with the other evidence, is the testimony of tavernkeeper Reinburg that on two occasions, at Abel's direction, he drove Abel to San Francisco, dropped him at the Sportorium, Blumenthal's place of business, and picked him up there about a half hour later.

The inference was justified that Blumenthal, Feigenbaum and the other salesmen were aware that their individual sales were part of a larger common enterprise, dependent on the carefully evolved arrangements to give the sales the guise of legitimacy, to dispose of a larger store of liquor.   Where a salesman knew, as did Feigenbaum, that at least a carload of whiskey was involved, it was an entirely reasonable inference that he knew that other salesmen, paralleling his efforts, were making sales similar to his.   On the basis of the evidence, the jury was well warranted in deciding that the facts dovetailed too neatly to be the result of mere chance.

[15] The evidence showed that some of the purchasers were unwilling to buy liquor without receiving a document to show purchase from a lawfully authorized source as required by state law.   With Francisco appearing as actual owner the scheme took on the aspect of one to sell its own whiskey illegally in the guise of lawful sales.

[16] Each salesman knew that he was receiving $30 to $40 above the ceiling; that Francisco was supplying the whiskey; that the elaborate arrangements were made not merely for his sales, but also

whiskey, but in the agreement to sell it in this unlawful fashion, regardless of who might own it.

With the case thus posited, it is true the salesmen did not know of the unknown owner's existence or part in the plan. And in a hypertechnical aspect the case as a whole might be regarded as showing in one phase an agreement among Goldsmith, Weiss and the unknown owner, X, and in the other an agreement among the five defendants to which X was not a party. Thus in the most meticulous sense it might be regarded as disclosing two agreements, with Goldsmith and Weiss as figures common to both.

Indeed that may be what took place chronologically, for conspiracies involving such elaborate arrangements generally are not born full-grown. Rather they mature by successive stages which are necessary to bring in the essential parties. And not all of those joining in the earlier ones make known their participation to others later coming in.

The law does not demand proof of so much. For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough

---

for others, see note 14; and that he had to have the cash, as well as the check, before delivery from Francisco was completed.

The basis for imputing such knowledge to Goldsmith and Weiss becomes not so compelling as with the admissions included, but nevertheless remains adequate. However the case is viewed, apart from the admissions, they knew the margin of legal profit left, whether for themselves or for others, after deducting the $24.50 per case, was only 77¢. If they actually owned and sold the whiskey, why sell below the ceiling in the face of the shortage and demand, when selling costs including the salesmen's compensation still were to be paid? If they did not own or sell at the $24.50 figure, then why the checks and false invoices in that amount? The inference is justified that either they or someone else to their knowledge was receiving more than the lawful price.

to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others.[17] Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.

Here, apart from the weight which the proof of the unknown owner's existence and participation added to the convictions of Weiss and Goldsmith, it added no essential feature to the charge against the five defendants. The whiskey was the same. The agreements related alike to its disposition. They comprehended illegal sales in the guise of legal ones. Who owned the whiskey was irrelevant to the basic plan and its essential illegality. It was a matter of indifferent detail to the salesmen, as by the same token was the fact that Goldsmith and Weiss were receiving and splitting only the $2 per case. It mattered nothing to the others whether those two received only that amount or the larger illegal sums.

We think that in the special circumstances of this case the two agreements were merely steps in the formation of the larger and ultimate more general conspiracy. In

---

[17] *Marino* v. *United States,* 91 F. 2d 691; *Lefco* v. *United States,* 74 F. 2d 66; *Jezewski* v. *United States,* 13 F. 2d 599; *Allen* v. *United States,* 4 F. 2d 688.

that view it would be a perversion of justice to regard the salesmen's ignorance of the unknown owner's participation as furnishing adequate ground for reversal of their convictions. Nor does anything in the *Kotteakos* decision require this. The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all. By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.

The case therefore is very different from the facts admitted to exist in the *Kotteakos* case. Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.

Here the contrary is true. All knew of and joined in the overriding scheme. All intended to aid the owner, whether Francisco or another, to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity. All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. He thus became a party to it and not merely to the integrating agreement with Weiss and Goldsmith.

We think therefore that in every practical sense the unique facts of this case reveal a single conspiracy of which the several agreements were essential and integral steps, and accordingly that the judgments should be affirmed.

The grave danger in this case, if any, arose not from the trial court's rulings upon admissibility or from its instructions to the jury. As we have said, these were as adequate as might reasonably be required in a joint trial. The danger rested rather in the risk that the jury, in disregard of the court's direction, would transfer, consciously or unconsciously, the effect of the excluded admissions from the case as made against Goldsmith and Weiss across the barrier of the exclusion to the other three defendants.

That danger was real. It is one likely to arise in any conspiracy trial and more likely to occur as the number of persons charged together increases. Perhaps even at best the safeguards provided by clear rulings on admissibility, limitations of the bearing of evidence as against particular individuals, and adequate instructions, are insufficient to ward off the danger entirely. It is therefore extremely important that those safeguards be made as

impregnable as possible. Here, however, the case as presented involved none of the risks common to mass trials. And, in view of the trial court's caution, the risk of transference of guilt over the border of admissibility was reduced to the minimum. So great was the court's concern that it expressly told the jury, in addition to the instructions set forth above, ". . . the guilt or innocence of each defendant must be determined by the jury separately. Each defendant has the same right to that kind of consideration on your part as if he were being tried alone."

We have considered petitioners' remaining contentions and find them without merit.[18]

The judgment is

*Affirmed.*

MR. JUSTICE DOUGLAS concurs in the result.

---

[18] These include the argument that petitioners were prosecuted under the wrong statute. Section 4 (a) of the Emergency Price Control Act makes it unlawful, as a misdemeanor, § 205 (b), for any person to sell or deliver any commodity in violation of price regulations, "or to offer, solicit, attempt, *or agree* to do any of the foregoing." (Emphasis added.) Petitioners regard the prohibitory words "or agree," etc., as repeal by implication of the general conspiracy statute, § 37 of the Criminal Code, insofar as otherwise it might apply to the acts forbidden by § 4 (a). There was no "implied repeal." Conviction under the general conspiracy statute requires more than mere agreement, namely, the commission of an overt act. See also *Taub* v. *Bowles,* 149 F. 2d 817; H. R. Rep. No. 827, 79th Cong., 1st Sess., 7–8.