Filed 9/29/16  P. v. Montoya CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>ROBERT STEVEN MONTOYA,<br><br>          Defendant and Appellant. | C076708<br><br>(Super. Ct. No. CRF121637) |

A jury convicted defendant Robert Steven Montoya of three counts of selling or offering to sell methamphetamine (Health & Saf. Code, § 11379, subd. (a)—counts 1, 3, & 19) and two counts of conspiracy to sell methamphetamine (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, § 11379, subd. (a)—counts 5 & 18).[1]  The jury acquitted defendant on all three counts of participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)—counts 2, 4, & 21) and did not sustain any of the criminal street gang enhancements (§ 186.22, subd. (b)(1)).  In bifurcated proceedings, the trial

---

[1]  Codefendant Dewayne Dean Lewis has appealed in case No. C076707.

court sustained allegations of a strike prior (Pen. Code, § 667, subds. (b)-(i)), two prior prison terms (Pen. Code, § 667.5, subd. (b)), and the commission of a felony while released on bail (Pen. Code, § 12022.1, subd. (b)).

The trial court sentenced defendant to state prison for an aggregate term of 13 years: on count 19, the midterm of three years, doubled for the strike prior; on counts 1 and 3, consecutive sentences of one-third the midterm, or one year each, doubled for the strike prior; a consecutive two-year term for the on-bail enhancement; and a consecutive one-year term for the prior prison term. For both conspiracy counts (counts 5 & 18) and the second prior prison term finding the court imposed and stayed sentence. (Pen. Code, § 654.)

Defendant appeals. He contends (1) counts 5 and 18 were duplicative counts, one of which must be stricken; (2) the second prior prison term must be stricken because the trial court sustained only one prior prison term and defendant served only one prior prison term; (3) the minute order must be corrected to reflect the oral pronouncement of judgment; and (4) the trial court abused its discretion in failing to strike the strike prior.

The People respond (1) the bases for the conspiracy charges in counts 5 and 18 were identical and one count must be reversed, (2) the stayed prison term for the second prior prison term enhancement was improper since there was only one prior prison term found to be true, and (3) the minute order requires correction. The People respond that the trial court did not abuse its discretion in denying defendant's request to strike the strike prior.

With respect to defendant's first contention, we conclude that the umbrella conspiracy (count 5) is not supported by sufficient evidence. Accordingly, we reverse defendant's conviction on count 5 and affirm his conviction on count 18, thereby rendering the contention moot.

With respect to defendant's second contention, we conclude the evidence supports only one prior prison term. We will modify the judgment, vacating the stay on the second prior prison term and striking the finding of a second prior prison term.

With respect to defendant's third contention, we modify the judgment and order correction of the minute order. We reject defendant's last contention and affirm the judgment as modified.

The relevant facts will be recounted in our discussion of defendant's contentions.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2011 and 2012 the Yolo Narcotics Enforcement Task Force (YONET) conducted an investigation (Operation Red Sash) of a criminal street gang known as the Broderick Boys. Based on that investigation, 12 defendants were charged with various crimes in an amended indictment. Defendant and codefendants Lewis, Esiquiel Zeke Butcher, and Guillermo Duke Rosales were tried together.

On May 23, 2011, undercover officer Ryan Bellamy called defendant and asked for a "teener," or one-sixteenth of an ounce of methamphetamine. They met on Evergreen Avenue in West Sacramento. Bellamy picked up defendant, paid $100 for 1.062 grams of methamphetamine, and then dropped off defendant at about the same place he had picked him up. Bellamy believed that defendant was a "street-level dealer," not a "big-time" dealer.

On June 7, 2011, the same undercover officer called defendant, seeking an "8-ball," or an eighth of an ounce, of methamphetamine. Defendant offered some "okay" methamphetamine for $150 and some "fire," or higher quality methamphetamine, for $200. Bellamy opted for the satisfactory quality and asked for a price break because the previous purchase was short (it should have been between 1.6 and 1.7 grams). They agreed to meet at a McDonald's restaurant on Harbor Boulevard. The officer saw a truck that he associated with defendant, but it did not stop. Later that day, defendant was arrested. He was a passenger in his truck, driven by Sophia Valadez, who had

3

1.401 grams of methamphetamine on her person.  A cell phone had a message from defendant to Valadez indicating he needed to "drop off this last sack," which Bellamy believed meant illegal drugs.  No conspiracy counts were associated with the May 2011 sale and June 2011 offer to sell.

On March 19, 2012, codefendant Lewis agreed to sell $100 worth of methamphetamine to an undercover agent (YONET Agent Gary Richter).  Lewis said he would arrange for his cousin to deliver the methamphetamine.  Richter met Lewis in West Sacramento and they went to a location on B Street.  While they waited for Lewis's cousin to arrive, Lewis told Richter he was $80 in debt for methamphetamine his roommate had smoked.  Defendant arrived in a white car, followed by codefendant Rosales in a black car.  Lewis got into defendant's car and then returned to Richter's car, where Lewis sold $20 worth of methamphetamine to Richter.  Richter gave Lewis an additional $80 to cover Lewis's debt and as a down payment for a gun.  Lewis returned to defendant's car.

Count 18 charged defendant, Lewis, and Rosales with conspiracy to sell methamphetamine, alleging a total of nine overt acts (overt acts 1 through 9), all relating to the sale of methamphetamine on March 19, 2012.  Count 19 charged defendant, Lewis, and Rosales with the sale of methamphetamine on March 19, 2012.  (Health & Saf. Code, § 11379, subd. (a).)  In connection with each count, a gang enhancement was alleged. (Pen. Code, § 186.22, subd. (b)(1).)  In connection with the March 19, 2012, sale, defendant and Lewis (but not Rosales) were also charged with participation in a criminal street gang.  (§ 186.22, subd. (a)—counts 21 & 38.)  The jury convicted defendant and Lewis but acquitted Rosales of conspiracy to sell and of the sale.  The jury did not find the gang enhancements to be true and acquitted defendant and Lewis of participation in a criminal street gang.

Count 5 charged defendant and 11 codefendants with conspiracy to sell methamphetamine from December 1, 2011, through April 24, 2012.  In addition to

4

defendant, Lewis, and Rosales, the nine other codefendants were Valentino Lorenzo Castanon, Andrew Thomas Vandyke, Christopher John Castro, Sr., Michael Timothy Morales, Butcher, Joseph Jeffrey Freed, Jason William Swearengin, Eugene William Espinoza, and Naomi Marcelina Castro. Count 5 set forth 45 overt acts. Overt acts 1 through 10 were the same overt acts set forth in count 7, which charged Lewis and Castanon with conspiracy to sell methamphetamine on December 8, 2011. Overt acts 11 through 17 were the same as the overt acts set forth in count 9, which charged Lewis and Vandyke with conspiracy to sell methamphetamine on December 14, 2011. Overt acts 18 through 23 were the same as the overt acts set forth in count 13, which charged Lewis, Castro, and Morales with conspiracy to sell methamphetamine on February 21, 2012. Overt acts 24 through 33 were the same as the overt acts set forth in count 17, which charged Lewis and Butcher with conspiracy to sell methamphetamine on March 15, 2012. Overt acts 34 through 42 were the same as the overt acts set forth in count 18, which again charged defendant, Lewis, and Rosales with conspiracy to sell methamphetamine on March 19, 2012.[2] In connection with count 5, a criminal street gang enhancement was alleged. (Pen. Code, § 186.22, subd. (b)(1).)

Based on gang expert testimony, the prosecutor argued that the coconspirators were members of the Broderick Boys and that Lewis, a member of the Broderick Boys, sold drugs with the assistance of other members of the Broderick Boys, including defendant, Butcher, and Rosales, and argued the charged sales and offer to sell were part of an ongoing criminal enterprise by the gang. "[O]ne very large conspiracy to sell methamphetamine that encompasses all of the defendants . . . . [¶] [O]ne big, large

---

[2] Overt act 43 related to Castro and Swearengin and stated that on April 24, 2012, they possessed methamphetamine and a loaded firearm. Overt act 44 related to Castro, Swearengin, and Freed, and stated that on April 24, 2012, they possessed an assault weapon. Overt act 45 related to Espinoza and stated that on April 24, 2012, he possessed ammunition. The jury was not read overt acts 43 through 45.

conspiracy. The Court read you all of the overt acts and all of the smaller conspiracies combined." The prosecution's gang theory does not appear to have been well received by the jury, which acquitted defendants on all gang charges and found none of the gang enhancements to be true. While convicting defendant and Lewis on count 5, the jury did not find the gang enhancement to be true with respect to either defendant. The jury acquitted Rosales and Butcher on all charges. Lewis was convicted on all the other individual conspiracies to sell or offer to sell and the corresponding sales counts, but the jury rejected all gang enhancements attached and gang charges related to those conspiracies/sales.

## DISCUSSION

### A.    The Conspiracy Counts

Defendant argues, and the People agree, counts 5 and 18 concerned the same criminal agreement with the same ultimate objective, that is, to sell methamphetamine on March 19, 2012, though count 5 was also comprised of additional, individual conspiracies between others to sell on other dates. Defendant asserts two reasons as to why he cannot be convicted of both counts.

First, citing *People v. Montoya* (2004) 33 Cal.4th 1031 (*Montoya*), defendant argues the offense alleged in count 18 is necessarily included in count 5. He is wrong. Applying the elements test, " 'if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' [Citation.]" (*Id.* at p. 1034.) Count 18 charged defendant with conspiracy to sell methamphetamine to Agent Richter on March 19, 2012, and listed nine overt acts. Count 5, which listed an additional 36 overt acts, could be committed without selling methamphetamine to Richter on March 19, 2012.

With the umbrella conspiracy (count 5), the jury was not asked to specify the overt act it found true to convict defendant. But it is the agreement, not the overt act, that is punished. The jury had to find unanimously that " '*an* overt act was done in furtherance

6

of the conspiracy, not in finding a particular overt act was done.' [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1133.) "We do not doubt that the requirement of an overt act is an element of the crime of conspiracy in the sense that the prosecution must prove it to a unanimous jury's satisfaction beyond a reasonable doubt." (*Id.* at p. 1134.) Count 18 is not necessarily included in count 5.

Second, citing *People v. Coyle* (2009) 178 Cal.App.4th 209 (*Coyle*), defendant claims he cannot stand convicted of two identical crimes: the conspiracy to sell on March 19, 2012, that was alleged in count 18, which was included as one of the individual conspiracies in count 5, the only one in which he was actively involved. In *Coyle*, the defendant killed a drug dealer and was charged with and convicted of three counts of murder under different theories—murder with the special circumstance that the murder was committed during a burglary, murder with the special circumstance that the murder was committed during a robbery, and second degree murder. (*Id.* at p. 211.) " '[M]ultiple charges and multiple convictions can be based on a single criminal act, if the charges allege separate offenses.' [Citations.]" (*Id.* at p. 217.) "In California, a single act or course of conduct by a defendant can lead to convictions 'of *any number* of the offenses charged.' [Citations.]" (*Montoya*, *supra*, 33 Cal.4th at p. 1034, citing Pen. Code, § 954.) But the defendant in *Coyle* was "charged [with] a single offense: murder" and the "three counts simply alleged alternative theories of the offense." (*Coyle*, at p. 217.) *Coyle* has no application here.

While *Coyle* has no application, the proposition that defendant advances is correct: where a group of conspirators agrees to commit a number of different crimes incidental to a single objective, there is only one conspiracy. A defendant convicted of that conspiracy cannot be separately charged with and convicted of conspiring to commit one of the crimes embraced by the larger conspiracy. (See *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133.) Thus, defendant cannot be convicted of both count 5 and count 18.

However, there is a more fundamental error in the record that affects our analysis of the issue. As hereafter discussed, our review of the record persuades us that defendant's conviction of count 5 is not supported by substantial evidence. Thus, any issue raised by the dual convictions is rendered moot because count 5 must be reversed given the lack of evidence to support it.

In considering the sufficiency of the evidence, we determine " 'whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' . . . Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citations.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

A conspiracy is an agreement by two or more persons to commit any crime. (Pen. Code, §§ 182, subd. (a)(1), 184.) "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.)

" 'In a conspiracy, the agreement to commit an unlawful act is not criminal until an overt act is committed, but when this happens and the association becomes an active force, it is the agreement, not the overt act, which is punishable . . . .' [Citations.]" (*People v. Jones* (1986) 180 Cal.App.3d 509, 516, italics omitted.) " 'One agreement gives rise to only a single offense, despite any multiplicity of objects.' " (*People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557.)

The present case does not at all resemble cases in which a single conspiracy has been found. "To determine if the evidence supports finding a single conspiracy (that is to say, a single general agreement), courts have looked for (1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants."

(*U.S. v. Portela* (1st Cir. 1999) 167 F.3d 687, 695, fn. omitted (*Portela*).) In determining whether there is interdependence among the participants, the question is " 'whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.' [Citation.]" (*Id.* at p. 695.)

Multiple conspiracies exist when the evidence demonstrates no interdependence among the participants and demonstrates separate agreements, each having a distinct, illegal end with no drawing of all together in a single, comprehensive plan. (*Blumenthal v. United States* (1947) 332 U.S. 539, 556-560 [92 L.Ed. 154, 168-169] (*Blumenthal*); *Kotteakos v. United States* (1946) 328 U.S. 750, 754-755 [90 L.Ed. 1557, 1561] (*Kotteakos*); *People v. McLead* (1990) 225 Cal.App.3d 906, 920; *People v. Elliott* (1978) 77 Cal.App.3d 673, 684-685; *Portela*, *supra*, 167 F.3d at p. 695.) To show a single conspiracy, considerations include "(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." (*Portela*, at p. 695, fn. omitted.) In determining whether there is interdependence among the participants, the question is " 'whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.' [Citation.]" (*Ibid.*) *McLead* noted that relevant factors, which were not determinative, included "whether the crimes involved the same motives, were to occur in the same time and place and by the same means," and the number of victims. (*McLead, supra*, 225 Cal.App.3d at p. 920.)

Here, instead of an overall plan to support a single conspiracy, the evidence supports a series of separate conspiracies over an extended period of time with several different factors. The evidence found credible by the jury was that Lewis had methamphetamine to sell or knew how to acquire it to sell and that he conspired with several others at certain times, including defendant on March 19, 2012, to obtain it and sell it to an undercover agent.

The facts here are similar to those in *Kotteakos*, where a broker arranged fraudulent loans with several borrowers, none of whom were connected, and presented

9

several conspiracies, like a wheel with spokes meeting at the center hub (the broker) without a rim enclosing the spokes. (*Kotteakos, supra*, 328 U.S. at pp. 752-755 [90 L.Ed. at pp. 1559-1561].) The facts in *Kotteakos* were summarized in *Blumenthal*, *supra*, 332 U.S. at p. 558 [92 L.Ed.2d at p. 169]: "[E]ach separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan."

The five individual conspiracies that made up count 5 involved different combinations of conspirators. Common to all the individual conspiracies and sales was only one person, Lewis. Each sale occurred on a different date. Each sale began with a text message from an undercover agent to Lewis. Prior to the agent's text message, it could not be foreseen that Lewis would be selling or trying to arrange with others to sell methamphetamine to the agent. Each sale occurred in a different manner. On December 8, 2011, Lewis had the agent drive him to Woodland, where Lewis obtained the methamphetamine from Castanon. Lewis then sold the drugs to the agent on the drive back to an apartment complex on West Capitol Avenue in West Sacramento (the West Capitol complex). On December 14, 2011, Lewis got into the agent's car with Vandyke. Lewis had the agent drive to Sacramento, where Lewis met a woman in a restaurant parking lot, and then drive back to the West Capitol complex, where Lewis and Vandyke went into an apartment. Lewis returned to the agent's car and sold him a "fake substance." On January 11, 2012, the agent complained about the fake substance and Lewis, alone, sold methamphetamine to the agent. On February 21, 2012, Lewis planned

to sell the drug to the agent but did not have it on his person. He could get it later, but because of his curfew, he arranged to have Castro provide it. Castro had the agent drive to a house where Morales came to the car to meet the agent. Castro went into the house, then returned to the agent's car with the methamphetamine. On March 15, 2012, the agent and his partner met Lewis at a taco shop, where Lewis made a phone call. Lewis spoke with the driver of a Lexus (allegedly Butcher), who arrived 10 minutes later. Lewis met with Butcher outside, then returned to the taco shop and asked for the money. When the agent demanded to see the drugs first, the Lexus left but returned 10 minutes later. Lewis spoke with the driver of the Lexus, then Lewis delivered the drugs to the agent, who was waiting in his car. On March 19, 2012, although Lewis and Agent Richter met at the taco shop, they left and went to a location on B Street to wait for Lewis's cousin (defendant) to deliver the drugs. Lewis also indicated he could find someone to assist Richter in the purchase of a gun. Defendant arrived in one car, followed by Rosales in another car. Lewis got into defendant's car, then returned to Richter's car with the methamphetamine. After Richter paid, Lewis returned to defendant's car.

The jury did not find any of the evidence of interdependence among the participants (such as the gang expert's testimony) to be persuasive, having rejected all of the gang charges and gang enhancements against all of the defendants. And, apart from the gang evidence, which is not all compelling, there is no other evidence suggesting the drug sales "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate [drug sale] had its own distinct, illegal end. Each [drug sale] was an end in itself, separate from all others, although all were alike in having similar . . . objects. Except for [Lewis], the common figure, no conspirator was interested in whether any [drug deal] went through. And none aided in any way, by agreement or otherwise, in [selling the drugs on the other occasions]. The conspiracies therefore were distinct and

11

disconnected, not parts of a larger general scheme . . . . There was no drawing of all together in a single, over-all, comprehensive plan." (*Blumenthal, supra*, 332 U.S. at p. 558 [92 L.Ed. at p. 169].)

Count 5 alleged an alternative theory—a single, all-encompassing conspiracy that finds no support in the record. Thus, we affirm count 18 but reverse count 5.

**B.      Stay of Prior Prison Term**

Defendant next contends, and the People concede, that the trial court erred in imposing a stayed sentence on a second prior prison term allegation that was never proved or sustained.

The court sustained the allegation on the second prior prison term even though it found only one prior prison term was served. The court then imposed but stayed sentence on that second prior prison term. Because the record supports only one prior prison term finding, we will modify the judgment, striking the finding and the stayed sentence on the second prior prison term.

The amended indictment alleged two prior prison terms. (Pen. Code, § 667.5, subd. (b).) It was alleged that defendant served a term of imprisonment for violating Penal Code section 245, subdivision (a)(1) in Yolo Superior Court case No. 04-0376. It was also alleged that defendant served a term of imprisonment for violating section 245, subdivision (a)(1) in Yolo Superior Court case No. 06-2845. To prove the two prior prison term allegations, the prosecutor submitted a Penal Code section 969b package. The evidence showed that defendant was convicted of the assault offenses in both case No. 04-0376 and case No. 06-2845 but was sentenced to state prison on July 25, 2006, for both offenses at the same time and began his sentence on August 8, 2006. The trial court sustained both prior prison term allegations, stating, "I would find that the People have proved . . . Case Enhancement 'g' [and] Case Enhancement 'h.' " In sentencing, the court imposed a one-year term for one prior prison term, then also imposed but stayed a one-year term for the second prior prison term.

12

Penal Code section 667.5, subdivision (b) provides for a consecutive one-year enhancement for "each prior separate prison term." Here, the Penal Code section 969b package showed defendant was sentenced at the same time for both cases. He did not serve a separate prison term for the two cases; instead, he served one prior prison term for both cases.

Since there was no evidence to support the second prior prison term, the trial court erred in sustaining the allegation and in imposing a stayed one-year term for the second prior prison term. We will modify the judgment, vacating the stayed sentence on the second prior prison term and striking the second finding.

## C. Minute Order Correction

Defendant contends, the People concede, and we agree that the minute order fails to reflect the trial court's imposition of a consecutive two-year term for the on-bail enhancement (Pen. Code, § 12022.1, subd. (b)) and the consecutive one-year term for the prior prison term (Pen. Code, § 667.5, subd. (b)). We will direct the trial court to prepare a corrected minute order accordingly. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## D. Refusal to Strike Prior Conviction

Finally, defendant contends the trial court abused its discretion in denying his request to strike the strike prior. We disagree.

### *Background*

The probation report reflects that the 28-year-old defendant had two prior felony convictions (in 2004 and 2006), both for violation of Penal Code section 245, subdivision (a)(1), a violent offense. Defendant's only other conviction was a misdemeanor violation of Vehicle Code section 23152, subdivision (b). Defendant had probation and parole violations and no meaningful crime-free periods. He had a longtime drug and alcohol addiction that he supported by selling methamphetamine; he engaged in drug sales one month after his release from jail for the same conduct. He lacked a high school diploma and long-term employment.

13

Defendant requested that the trial court strike his strike prior, arguing his addiction to methamphetamine, which resulted from his using Ritalin for his mental health problems, led to his life of crime. He noted that his "Rap Sheet" reflected "drug use has been a chronic problem throughout his life" and "his criminal past has been motivated solely by his addiction to drugs." He noted his criminal past was "littered with various Driving Under the Influence charges as well as drug possession convictions." He requested treatment for his drug addiction.

The trial court noted it had read defendant's request to strike the strike prior as well as the current probation report and the probation report filed in the 2006 (strike) case. The court stated: "From all of those documents, I have found that the defendant has an extensive criminal history that began in the year 2000, and there are three crimes of violence since the defendant first came into the criminal justice system. One was as a juvenile back in 2001. That was a [Penal Code section] 245[, subdivision] (a)(1), assault by force likely to produce great bodily injury, and a [Penal Code section] 243. Then he had a 2004 conviction, which is referenced in the latest probation report. That is a conviction for violation, again, of [section] 245[, subdivision] (a)(1). He was placed on probation in this case. And, finally, we have the assault with a deadly weapon case from 2006 where the defendant was committed to state prison." The court counted the number of convictions (eight felony, four of which were crimes of violence) and noted that defendant had never been out of custody for an extended period of time. The court also noted that in the current case, defendant had been released for less than two months before he was arrested again for a drug sale and conspiracy. The trial court "accept[ed] defendant's] representation" that the current crimes were committed because he was addicted to methamphetamine. In denying defendant's request to strike the strike prior, the trial court cited defendant's criminal history and the lack of an extended period of crime-free life.

*Analysis*

A trial court may strike a felony conviction for purposes of sentencing if and only if the defendant falls outside the spirit of the three strikes law. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) The trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Ibid.*)

Striking a strike prior is a departure from the sentencing norm, and as such, we may not reverse the denial of a request to strike the strike prior unless the defendant shows the decision was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) Reversal is justified where the trial court was unaware of its discretion or applied improper factors. (*Id.* at p. 378.) But where the trial court knew of its discretion, " 'balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling.' " (*Ibid.*)

Here, the trial court considered defendant's criminal history and his lack of prospects for the future given his addiction to methamphetamine. Defendant has not shown that the trial court's denial of his request was irrational or arbitrary. Defendant had several violent felonies and had been to prison but continued his life of crime. Defendant has failed to demonstrate that the trial court abused its discretion in denying his request to strike the strike prior.

## DISPOSITION

Defendant's conviction and sentence on count 5 (conspiracy) is reversed. The trial court's finding and stayed sentence on the second prior prison term is reversed and vacated, respectively, and the allegation is dismissed for lack of proof at the bifurcated

15

proceeding.  The trial court is directed to prepare an amended abstract of judgment accordingly and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.  The trial court is also directed to prepare a corrected minute order reflecting the two-year sentence on the on-bail enhancement and the one-year sentence for the prior prison term.  As modified, the judgment is affirmed.

          RAYE         , P. J.

We concur:

      BUTZ       , J.

     RENNER    , J.

16