UNITED STATES of America

v.

William F. SCHOENHUT, Jr.

Crim. A. No. 76-472.

United States District Court,
E. D. Pennsylvania.

May 10, 1977.

David W. Marston, U. S. Atty., Peter J. Smith, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Morris Paul Baran, Philadelphia, Pa., for defendant.

## MEMORANDUM

GORBEY, District Judge.

This matter is presently before the court on defendant's motion for judgment of acquittal, arrest of judgment, and a new trial. The defendant was found guilty by a jury on January 12, 1977, on five counts of the above-captioned indictment, which charged him with illegal receipt of a fee by a bank officer, misapplication of bank funds, two counts of making false reports to a bank, and conspiracy. As this was a rather complex trial, a statement of the facts is necessitated.

## I. FACTS

From sometime in 1972 through August, 1973, defendant, William Schoenhut, was an Assistant Vice President in the Mortgage Department of Central Penn National Bank ("Central Penn") in Philadelphia. From November of 1968 to September of 1973, John Jacobsen was the Vice President of the Mortgage Department at Central Penn and was defendant's immediate supervisor. When Mr. Jacobsen resigned from Central Penn in August of 1973, defendant succeeded him as the Vice President of the Mortgage Department. From at least mid-1972 through the fall of 1974, H. Gerard Heimbecker, David Pierce, Ronald Nirenberg and Philip Inverso were employees and/or officers of the Delaware Valley Mortgage and Realty Corporation ("Delaware Valley") which had its principal office in Philadelphia, with at least one branch office in Wilmington, Delaware.

Delaware Valley is a mortgage broker. Its business consists of buying, selling, and servicing mortgages, and to a lesser extent, providing financing for construction projects. What Delaware Valley does primarily is purchase mortgages through various realtors at a certain rate of interest. Delaware Valley then attempts to resell the mortgages to permanent lenders such as savings and loan associations or banks at lower rates of interest. During the interim period while it holds the mortgages, Delaware Valley needs extensive amounts of capital.

In early 1972, Heimbecker and Inverso, acting on behalf of Delaware Valley, approached Jacobsen and requested that Central Penn grant Delaware Valley a line of credit in the amount of $500,000. This loan was to be in the form of a "mortgage warehouse line". This was granted and was subsequently increased three times to two million dollars. Jacobsen was unable to remember while testifying at trial the exact terms of this extension of credit. No written agreement between Central Penn and Delaware Valley was ever introduced at trial. Whether or not such a written agreement even exists was unknown to the jury and to me. However, many of the witnesses at the trial testified concerning the nature of this "warehouse line". Ronald Nirenberg, who was Assistant Vice President at Delaware Valley from April, 1972 to August, 1974, described a warehousing account as follows:

"A Basically it's like a line of credit. We would get applications for a particular mortgage, the buyer's application from the real estate broker and process it, getting a credit report, commitment and so forth on it, and when we were notified by the real estate broker they were ready to go to settlement, and we had our proper documentation together, we would prepare mortgage papers and we would go to settlement with the title company, and we would draw out a check from a warehousing line payable to such title company or an attorney that represents the title company and they would make disbursement. What we would do then is send a collateral note down to our warehousing bank, Central Penn, to cover that particular settlement check out. And we had a certain line of credit up to a certain amount of money that we could go with our line."

(N.T. 2.38, 2.39)

Mr. Jacobsen described mortgage warehousing as:

"A It is a style of an extension of credit whereby a mortgage banker, an originator of the mortgage loans would pledge

those mortgages as collateral for an extension of credit. The purpose being to hold those loans in a pool until they could be delivered to an eventual purchaser of the mortgages."
(N.T. 3–70)

Mr. Inverso, who was Vice President of Delaware Valley for approximately two and one half years from 1972 to August of 1974, testified that a warehousing or credit line is:

"A A warehousing line, basically it would relate to something similar to a ready money account and an individual would apply to a bank and establish a line of credit of say $1,000 and the bank would supply the individual with checks, and at the individual's convenience, they would use those checks to apply toward the credit that would work the same as a warehouse line, except in Delaware Valley's account, it was relating to mortgages as we used it and it was a credit line in effect."
(N.T. 3–14)

Sometime in the spring of 1973, David Pierce, who was Manager of the Delaware branch office of Delaware Valley, advised Heimbecker, Inverso and Nirenberg that there was a parcel of land in Smyrna, Delaware, owned by the Karlee Corporation, which he felt might be very suitable for development by Delaware Valley. Delaware Valley had previously purchased raw land such as this with the intention of financing builders who would develop the land (N.T. 1–66). Heimbecker, Inverso and Nirenberg were all officers at Delaware Valley at this time. They decided, along with Pierce, that it might prove very profitable for them to attempt to develop this land on their own. That is, rather than have Delaware Valley purchase the land and develop it or finance builders who would develop it to produce a profit for Delaware Valley, they were going to purchase it themselves and develop it themselves as a side venture. As their plan unfolded they were going to build sixty-seven homes on part of this parcel of land which was known as the "Karlee Tract". It

was also their initial intention to attempt to secure financing for this project from Central Penn. They would need financing both to purchase the land and to construct the homes.

Sometime in the spring of 1973, Schoenhut inspected the site and submitted his recommendations and criticisms of the project to Heimbecker. The defendant also met with Pierce and Heimbecker during this period to discuss, among other things, the cost of the project and what periodic draw downs would be needed.

Central Penn never did directly loan the money needed for the project to those involved. Apparently, the reason for this was that Schoenhut turned down the request propounded by Heimbecker because the property in Delaware was too far away from Philadelphia for Central Penn to get involved. The exact reason was not testified to by anyone except Schoenhut. Financing was subsequently obtained from Delaware Valley, using the money on its warehouse line.

In the spring of 1973, the Greenmeadow Holding Company was formed for the purpose of taking title to the stock of the Karlee Corporation. The shareholders of Greenmeadow Holding Company were Heimbecker, Nirenberg, Pierce, Inverso and Schoenhut. The percentage of the shares which was initially allotted to Mr. Schoenhut in relation to the other four men was one of the facts in dispute at the trial. Eventually, at least, he did obtain an equal percentage as was evidenced by the stock certificates themselves which were introduced as government Exhibit 4. Each of the five certificates was dated July 26, 1973, was ostensibly signed by H. Gerard Heimbecker as Secretary of the corporation, and gave each of the five shareholders 22.5 shares.

On the morning of July 19, 1973, a settlement was held in Philadelphia wherein Greenmeadow Holding Company purchased the stock of Karlee Corporation. On that afternoon, Delaware Valley granted a construction loan to the Karlee Corporation in the amount of $1,495,400. All of the docu-

ments evidencing this indebtedness to Delaware Valley, including the construction loan agreement, the corporation bond and the mortgage, were signed by Pasquale LiTrenta and Anne Laut on behalf of Karlee. LiTrenta and Laut, however, did not sign their own names. Instead they signed names supplied to them by Nirenberg and Inverso. As Mr. Pierce testified, the reason that none of the shareholders of Greenmeadow signed as officers of Karlee or Greenmeadow was that they did not want the owners of Delaware Valley to realize that some of their officers and employees were involved in the loan from Delaware Valley to Karlee (N.T. 88). Delaware Valley then forwarded copies of these documents and a demand collateral note to Central Penn as part of its security for the warehouse line of credit. These fraudulent papers being sent to Central Penn formed the basis of Count VI of the indictment wherein Mr. Schoenhut is charged with " . . . knowingly and wilfully, and with intent to defraud said bank, made and caused to be made a materially false report, statement and entry into the books of said bank, . . .". All of the witnesses who testified at trial concerning the signing of these documents by LiTrenta and Laut testified that Mr. Schoenhut was not present when these people came to the settlement and signed the documents. They further testified that these people were brought to the settlement by Nirenberg and Inverso.

Subsequent to July, 1973, the owners of Delaware Valley discovered that Nirenberg and Inverso and to a much lesser extent, Heimbecker, had collectively and in some cases individually perpetrated schemes whereby they embezzled in excess of a million dollars from Delaware Valley. One of these schemes involved drawing funds down on the Karlee project to pay for work which was never done. Nirenberg or Inverso would certify that certain work such as water and sewer lines had been done, would certify that they had inspected the work, or had it inspected, and would authorize payment for this work. However, such payments were not sent to the Karlee account known to all the shareholders of Karlee.

These payments were sent to a separate account set up by Nirenberg and Inverso. It was not disputed that Schoenhut was completely unaware and completely uninvolved in these embezzlements. What Schoenhut is accused of by the government, although not specifically indicted for, is a failure to inspect the Karlee project prior to payments being made by Delaware Valley to Karlee. Had he inspected, the government suggests, certain funds would not have been able to have been diverted by Nirenberg and Inverso. One of the major issues at trial was what responsibility, if any, did Schoenhut, in his capacity as an officer of Central Penn, have to inspect the Karlee project prior to payments being made for completed work.

In November of 1973, Schoenhut, as a condition of his employment, completed a "conflict of interest questionnaire" for Central Penn. This questionnaire was introduced into evidence as government Exhibit number 26. In this questionnaire, among other things, he stated that he did not have any interest, financial or otherwise, in any company or organization which borrows from or is a customer of Central Penn; he stated that in the past year he did not receive any gifts, discounts, or other benefits, including loans, from anyone who borrows from or is a customer of the company; and he stated that in the past year he has not acquired any stocks, securities or property which were available to him by reason of his employment with Central Penn. It is charged by the government that Schoenhut's receipt of the Greenmeadow stock proves that Schoenhut supplied false answers to this questionnaire. Inverso, Nirenberg and Pierce testified at trial that Mr. Heimbecker told them that Schoenhut was initially to receive ten percent of the stock for his efforts in procuring the loan from Central Penn, and that his interest was increased to twenty percent when he interceded on their behalf to help cover up certain of the aforementioned embezzlements. Mr. Schoenhut testified that Heimbecker gave him twenty percent of the stock at one time, and that he gave it to

him gratuitously, possibly because of the many favors Schoenhut had done for Heimbecker in the past. Heimbecker was not called as a witness by either the government or the defense.

It was stipulated at trial that at all times pertinent to the indictment, Central Penn National Bank was insured by the Federal Deposit Insurance Corporation (Government Exhibit # 1). It was further conceded that at all times relevant to the indictment, Schoenhut was an officer of Central Penn National Bank.

## II. ARGUMENTS

For the sake of clarity, I will attempt to discuss each count of the indictment separately. However, at times the arguments for the various counts overlap, in particular with reference to Count IX which is the conspiracy count.

### COUNT I

Defendant is charged in Count I as follows:

"On or about July 19, 1973 at Philadelphia, in the Eastern District of Pennsylvania, William F. Schoenhut, Jr., then being an Assistant Vice President at Central Penn National Bank, a bank the deposits of which are insured by the Federal Deposit Insurance Corporation, did knowingly and unlawfully stipulate for, agree to receive and received a fee, commission, gift and thing of value, to wit: shares of stock in Greenmeadow Holding Company, a company which owned all of the stock of Karlee Corporation, for endeavoring to procure and procuring for Karlee Corporation and the stockholders of Greenmeadow Holding Company, through the warehousing account of Delaware Valley Mortgage and Realty Corporation at Central Penn National Bank, a loan and an extension of credit, in the approximate amount of $1,495,400; and said William F. Schoenhut, Jr. was not legally entitled to receive the above fee, commission and thing of value.

In violation of Title 18, United States Code, § 215."

The defendant argues that the language of this Count of the indictment does not charge a crime within the meaning of the subject statute, and alternatively, the record of this case does not support a conviction under this Count of the indictment. 18 U.S.C. § 215 provides as follows:

"§ 215. *Receipt of commissions or gifts for procuring loans*

Whoever, being an officer, director, employee, agent, or attorney of any bank, the deposits of which are insured by the Federal Deposit Insurance Corporation of a Federal intermediate credit bank, or of a National Agricultural Credit Corporation, except as provided by law, stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person, firm, or corporation, for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation, from any such bank or corporation, any loan or extension or renewal of loan or substitution of security, or the purchase or discount or acceptance of any paper, note, draft, check, or bill of exchange by any such bank or corporation, shall be fined not more than $5,000 or imprisoned not more than one year or both."

To be guilty of Count I, it must first be proven that defendant was an officer of a bank which was insured by the Federal Deposit Insurance Corporation at the time of the alleged incidents. These facts were agreed to by the defendant. The government must further have proved that the defendant procured or endeavored to procure a loan for Karlee from the Central Penn National Bank. The defendant argues that since the construction loan agreement was between Delaware Valley and Karlee, he cannot be guilty of this offense as he was an officer of Central Penn, but not an officer of Delaware Valley, and Delaware Valley is the entity which granted the loan, not Central Penn. The government submits that since Delaware Valley in turn was getting its money from Central Penn the statute is applicable. The defend-

ant is not charged with endeavoring to procure a loan directly from Central Penn to Karlee, although one of the unindicted co-conspirators stated that he thought this was why Schoenhut was to be asked to join the alleged conspiracy (Inverso, N.T. 3.53, 3.54).

 Schoenhut is charged with receiving a thing of value, shares of stock in Greenmeadow Holding Company, for endeavoring to procure and procuring for Karlee a $1,495,400 loan and extension of credit through the warehouse account of Delaware Valley. In support of his argument that the indictment does not state an offense under the statute, the defendant cites the case of *United States v. Gerken,* D.C.N.Y., 182 F.Supp. 738, wherein the United States District Court for the Eastern District of New York, in 1960 construed 18 U.S.C. § 220 which was the predecessor of 18 U.S.C. § 215. In that case the defendant was a Vice President of the Security National Bank of Long Island. He was charged with receiving a fee for endeavoring to procure a loan from the Riverhead Savings Bank for a third party, the Huntington Station Realty Corporation. The Security National Bank of Long Island and the Riverhead savings bank were not related to each other in any manner. The funds used for the loan given by Riverhead Savings Bank did not come from Security National Bank of Long Island. In dismissing the indictment the court stated:

"On December 31, 1949, of a total of 14,687 operating commercial and mutual savings banks in the United States, 13,-628 were institutions whose deposits were insured. U.S.Code Cong. & Adm.News, p. 3766 (1950). The Government would have the court so construe section 220 that an attorney for one insured bank could not receive a fee for procuring a loan for a client by any one of the banking institutions throughout the United States so insured, no matter how remotely situated from his bank client, without becoming a criminal.

The legislative history of 18 U.S.C. § 220 plus the unreasonable and absurd consequences to which the interpretation urged by the Government would lead, satisfy the court that the indictment in the instant case does not allege a crime within the meaning of the statute." *Id.* at 742.

In arguing against the defendant's motion in arrest of judgment, the government cites *United States v. Bristol,* 473 F.2d 439, a 1973 Fifth Circuit decision. In that case the court was concerned with 18 U.S.C. § 213 which provides that a bank examiner may not accept a loan from a bank or any person connected therewith examined by him. The law involved in the *Bristol* case would be applicable in the instant case. In that case the defendant accepted a loan from a company which was controlled by the Chairman of the Board of the Sharpstown State Bank, which bank Bristol had recently examined. The money which the company paid came directly from the Chairman of the Board. In denying Bristol's appeal, the court stated:

"Congress, in passing section 213 and its companion section 212 (which prohibits bank officers from making a section 213 loan), intended to proscribe certain financial transactions which could lead to a bank examiner carrying out his duties with less than total, unbiased objectivity. With the intent of Congress evident from the face of the statute, a construction which would allow a bank officer to circumvent that intent simply by channeling a loan through a controlled shell corporation is untenable. Thus, we hold that the facts alleged in the indictment concerning the mechanics of the loan, if proved would constitute a violation of 18 U.S. C.A. § 213." *Id.* at p. 442.

In the instant matter the government argues that Delaware Valley was merely a conduit through which a loan was made from Central Penn to the Karlee Corporation. I do not believe that either of the above cases is controlling in this matter as the relationship between Delaware Valley and Central Penn is somewhere in between the two extremes cited above by the defendant and by the government. Indeed, I find it extremely difficult to make a deter-

mination as to whether or not the instant situation is one where the intermediary, Delaware Valley, is merely a conduit, or whether Delaware Valley in fact is the true lender and Central Penn and its employees are sufficiently divorced from the matter so that I might grant defendant's motion in arrest of judgment. I cannot accept defendant's argument that to be guilty of an offense under § 215 he must have procured or endeavored to procure a loan *directly* from Central Penn. If the loan from Delaware Valley to Karlee had to be approved by Central Penn and the defendant procured or endeavored to procure this approval, I would confirm his conviction under Count I. Even if the explicit approval of Central Penn were not needed and the defendant acted to insure that Central Penn would in no way interfere with the loan from Delaware Valley to Karlee, I would find that Count I stated an offense under § 215. However, the problem arises, as I will explain below, that it was not shown in court, or otherwise, exactly what the relationship was between Central Penn and Delaware Valley. For this reason I will refrain from deciding defendant's motion in arrest of judgment and instead grant defendant's motion for judgment of acquittal as the evidence presented by the government is insufficient to sustain a conviction.

The agreement between Central Penn and Delaware Valley was either never reduced to writing or for some reason neither the government nor the defendant chose to introduce it into evidence. Therefore, I must rely on the testimony of the various witnesses to determine whether or not it was necessary for the Delaware Valley conspirators to enlist the aid and support of the defendant, William Schoenhut, in order to secure the loan from Delaware Valley. Aside from approval of the initial construction loan, the government contends that Schoenhut's complicity was necessary to in-

sure that nobody from Central Penn ever inspected the construction site prior to any funds being drawn down [1] from the loan to pay for the cost of construction. The reason for this may in part be due to a fear that such an inspection would lead to disclosure of the true principals of Karlee. In August, 1973, Karlee applied for payment of a $90,000 draw down thereby *inferring* that water and sewer lines were in fact completed as per the construction loan agreement. The officers of Delaware Valley were required to certify that they inspected the site and that this work was in fact done. Of course the officers of Delaware Valley who were required to make this certification and those who applied for the payment on behalf of Karlee were one and the same. As Mr. Nirenberg testified:

"Q You stated on cross examination, I believe, that you yourself and Mr. Inverso and Mr. Heimbecker planned and carried out the transaction that involved the taking out of $90,450 from the Karlee account and the use of at least part of that money for some other purpose, is that correct?

A Yes, sir.

Q Were the three of you directors of Greenmeadow Holding Company?

A Yes, sir."

(N.T. 3–8)

In an attempt to establish what role Central Penn played in the loan between Delaware Valley and Karlee, I will start with an examination of the testimony of John Jacobsen who was the Vice President in charge of the Mortgage Department when the warehouse line was initially established in 1972 (N.T. 3–71). Mr. Jacobsen testified about Central Penn's policies concerning inspection and payments when Central Penn was the direct lender on a construction loan. He was also asked, as follows, about Central Penn's policy when its borrower granted a construction loan to a third party:

---

1. A "draw down" is a term commonly used in connection with a construction loan. What it means is that whenever construction is completed to a certain stage, the builder applies to the lender for payment of a certain percentage of the loan. Before making these payments, however, a lender inspects the construction site to insure that the work is in fact done. Such inspections are specifically provided for by Delaware Valley in paragraphs 4 and 11 of the construction loan agreement (Government Exhibit # 6).

"Q Did you have any special policy regarding warehouse lines where the borrower in turn loaned out money as construction loans?

A I don't know that we had a specific written policy on that subject, but it was my feeling."

(N.T. 3–77)

Mr. Jacobsen then testified extensively about specific inspection procedures when Central Penn was a direct lender. He also testified that Central Penn only gave out construction loans in Southern Pennsylvania and Southern New Jersey. He specifically stated:

"I don't recall any projects being outside of that general geographic area."

(N.T. 3–80)

Concerning Central Penn's responsibility to inspect when Delaware Valley makes the construction loan, Mr. Jacobsen testified on cross as follows:

"Q Now in a situation of that kind, it is Delaware Valley who would be considered the customer of the bank, is that correct, sir?

A Yes, Delaware Valley was the borrower of the warehousing line.

Q And all relationships as far as borrower and lender were only between Central Penn and Delaware Valley?

A Yes.

Q And as far as the procedures that you have testified to on direct examination, these procedures would normally apply when Central Penn was making a direct loan to somebody in the construction business, isn't that correct, sir?

A I think yes.

Q So, when you were talking about inspection procedures for construction drawdowns, that would normally only apply when Central Penn is a direct lender to the party constructing, is that correct, sir?

A If we are talking about a situation, sir, where Central Penn is lending to a borrower who is in fact the builder—developer, yes, that is true.

Q But normally, where they are dealing with a construction loan built into a warehousing loan, you leave that obligation to the primary lender, I mean, the borrower, isn't that correct?

A I think you would say you would leave it to the primary borrower but I don't feel you would completely ignore the activity within that construction loan and the purposes for which the funds are being used."

(N.T. 3–86, 3–87)

On re-cross Mr. Jacobsen further testified in this area:

"Q Where the borrower is in the construction business himself, where the borrower is going to use these funds for construction purposes and where Central Penn has in fact loaned these monies to that borrower, construction site inspections would be more important, would they not?

A They would be a prerequisite rather than just more important. It would be an absolute necessity to make an inspection before a drawdown or an advance was made.

Q That is not always the case, is it, when the construction loan is part of the warehouse line and the borrower in turn lends the money to someone else?

A I think it is a matter of internal operational preference and procedure and control as to how often you will make that inspection in that set of circumstances."

(N.T. 3–94, 3–95)

On re-direct examination Mr. Jacobsen stated:

"Q Would inspection still be made under the set of facts that was described to you in that last question by Mr. Baran?

A Yes."

(N.T. 3–96)

Although Mr. Jacobsen seems to indicate that some inspections would be made, he does not say when these inspections would be made, how often they would be made, by whom they would be made, or more importantly, whether or not it was the responsibility of Central Penn's officers to make sure they were made. The only thing he

makes perfectly clear is that Delaware Valley is the one who is responsible for making these inspections. Certainly this testimony is insufficient to warrant a conviction of Mr. Schoenhut, especially considering the testimony that the site that was to be inspected in Southern Delaware was outside the range of Central Penn. In fact, I will take judicial notice that the reason lending institutions such as Central Penn do not grant construction mortgages beyond a certain distance is because it is too far for them to travel to make the necessary inspections in the ordinary course of the bank's business. Delaware Valley had a branch office in Delaware so the distance of the project from Philadelphia would be no impediment to Delaware Valley.

Mr. R. Laird Sommerville, Jr., who is the Executive Vice President in charge of the commercial loan portfolio at Central Penn and who was Mr. Jacobsen's immediate supervisor in 1973, also testified. Concerning the warehouse line, he testified on cross:

"Q Okay. Now on the warehouse line, the Delaware Valley warehouse line with Central Penn, sir, the customer is Delaware Valley, isn't that correct?

A That is correct.

Q And the individual mortgage or the various construction loan agreements that might be involved in the warehouse line are matters between the borrower, Delaware Valley and these people on the line, isn't that correct, sir?

A That is correct.

\* \* \* \* \* \*

Q And the primary responsibility or the party that Central Penn would look to in the event of any financial difficulty would be Delaware Valley, isn't that correct, sir?

A Correct."

(N.T. 3–115, 3–116)

Mr. Sommerville then further testified that if there were a default on the loan to Delaware Valley, they would thereafter look to Delaware Valley's parent corporation, Mullin and Lonergan, Associates, and to various mortgages and notes on the line.

In deciding a motion for judgment of acquittal it is not for the court to weigh the evidence or to determine the credibility of the witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. *Glasser v. United States,* 315 U.S. 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The test on a motion for judgment of acquittal is whether the evidence is such that reasonable minds could find guilt beyond a reasonable doubt. *United States v. Hopkins,* 354 F.Supp. 634, 636 (E.D.Pa.1973). The government states in its memorandum contra defendant's motions for judgment of acquittal, arrest of judgment and new trial that:

"The evidence set forth above is, at the very least, consistent with the conclusion that Defendant, through a series of actions, tried, attempted, set about, and attended to, the securing of funds from Central Penn, his employer. It is consistent, at the very least, with the conclusion that Defendant received shares of stock in return for his 'efforts' and subsequently was given additional shares for further efforts on behalf of Delaware Valley and his associates in Greenmeadows.

The explanation of Defendant's involvement urged on the jury and this Court by the defense, i. e., that he was a passive observer of the use of the warehouse line as a source for funds, ignores the evidence that (1) Central Penn's funds were those utilized to make the transaction possible; (2) that Central Penn had an interest in insuring certain preliminary requirements were met and that at least some supervisory controls were maintained over the flow of money; (3) that Defendant was the only person at Central Penn who knew of the relationship between the Delaware Valley officers and Karlee-Greenmeadow; (4) that funds flowed via wire transfers directly from Central Penn to a Karlee bank account and (5) that Defendant was the person at Central Penn with direct responsibility for overseeing the function of the warehouse line.

The thrust of the testimony of Jacobsen, Sommerville and Myers was that Defendant had a responsibility to insure that the warehouse line, since it was ultimately Central Penn's money, was not misused.' Even accepting Defendant's testimony with regard to the extent of his involvement, it was clearly established that he (1) accepted the Greenmeadow stock; (2) met with Pierce and Heimbecker to work out the details of the financing and construction; (3) visited the site twice *after receiving the stock*; (4) advised Heimbecker on various aspects of the economics and financing of the venture; (5) told Heimbecker he saw no reason why the financing could not be put through the warehouse line in terms which expressly use the word 'approval'; and (6) failed to advise anyone at Central Penn of his involvement in the venture and the relationship of Delaware Valley officers to Karlee-Greenmeadow." (Emphasis supplied) (Pp. 16–17)

Addressing the contention that defendant knew of the relationship between the Delaware Valley officers and Karlee-Greenmeadow, I must state that this relationship is not illegal per se. What taints the construction loan is the concealment from Delaware Valley of the true identities of the principals of Greenmeadow. As suggested earlier there is no evidence that defendant was present when LiTrenta and Laut assisted the Delaware Valley conspirators when they went to settlement and signed fictitious names. Inverso testified concerning the events on the day of settlement, July 19, 1973 as follows:

"Q By the way, when these parties came in at the time of settlement to sign fictitious names to the agreement, Mr. Schoenhut wasn't there, was he?

A No, sir.

Q But there was an attorney there, wasn't he? Wasn't there an attorney?

A Not present at the signatures, no, sir.

Q But was he present at the settlement?

A Yes, sir.

Q Did you tell the attorney, by the way, these are people that are coming in to sign phoney names to the agreements?

A No, sir."

(N.T. 3–51)

Nirenberg confirmed Inverso's statement that Schoenhut was not present when LiTrenta and Laut signed the fictitious names.

"Q But there were fictitious signers on some of the agreements?

A Yes, sir.

Q And you testified that you brought one in and Mr. Inverso brought the other one in?

A Yes, sir.

Q Now, Mr. Schoenhut had nothing to do with that, did he?

A No, sir."

(N.T. 2.86)

The evidence is clear that defendant was not present when false names were affixed to the agreement between Karlee and Delaware Valley. In fact the evidence is quite clear that this was done without Schoenhut's knowledge or acquiescence. Further, there is no credible evidence that Schoenhut was aware of the intention of his alleged co-conspirators to conceal anything from Delaware Valley.

Nirenberg, Pierce, and Inverso all testified that they entered into an illegal conspiracy with Heimbecker and that Heimbecker advised them that Schoenhut would be brought into the conspiracy. Pierce testified:

"Q Now sir, you testified yesterday about certain understandings that you had with regard to Mr. Schoenhut receiving stock in Greenmeadow.

A Correct.

Q Were you present when conversations were allegedly had between Mr. Heimbecker and Mr. Schoenhut pertaining to the same?

A No.

Q And you only know what Mr. Heimbecker told you, isn't that correct?

A Both Mr. Heimbecker and Mr. Nirenberg.

Q But you only know what someone else told you?

A All I know is what I saw in correspondence and what people told me, yes.

Q You were not present when such an understanding was made?

A No."

(N.T. 2.9, 2.10)

Nirenberg likewise testified:

"Q Mr. Nirenberg, you testified as to certain arrangements with Mr. Schoenhut pertaining to acquisitions of stock in Greenmeadow, is that correct, sir?

A Yes, sir.

Q You didn't personally meet with Mr. Schoenhut, did you?

A No, sir.

Q As a matter of fact you of your own knowledge do not know what occurred, do you?

A No, sir.

Q You only know what you were told by Mr. Heimbecker?

A Yes, sir.

Q And your testimony concerning a later agreement as to the increase in percentage of stock wherein Mr. Schoenhut was to receive additional shares, you don't know that of your own knowledge, do you?

A No, sir.

Q You only know what Mr. Heimbecker told you?

A Yes, sir."

(N.T. 2.85, 2.86)

Inverso also confirmed:

"Q Mr. Inverso, on direct examination you testified to an agreement whereby Mr. Schoenhut was to receive stock in Greenmeadow Corporation, is that correct, sir?

A That's correct, sir.

Q You were not present at the time of such an agreement, if one in fact existed between Mr. Schoenhut and Mr. Heimbecker, were you?

A No, sir.

Q And you only know what you heard from Mr. Heimbecker?

A That is correct."

(N.T. 3–48)

"Q You also testified that there came a time when Mr. Schoenhut's interest, if any, would be increased, is that correct?

A That's correct.

Q You were not present when such an agreement took place, if in fact one did, were you?

A Between the two parties, sir?

Q Yes.

A No, sir.

Q You don't know of your personal knowledge if such an agreement did take place, do you?

A Personal knowledge, no, sir.

Q And you only know what Mr. Heimbecker told you, if in fact he told you anything, isn't that correct?

A That's correct, sir."

(N.T. 3–49)

"Q Now, you really don't know of your personal knowledge whether or not Heimbecker, if he told you anything about this was telling you the truth, do you?

A No, sir."

(N.T. 3–54)

■ Once the existence of a conspiracy is established only slight evidence is required to connect any given defendant with it. *United States v. Westover,* 511 F.2d 1154 (9th Cir. 1975). Of course, the slight evidence must be of the quality which will reasonably support a conclusion that the particular defendant in question willfully participated in the unlawful plan with the intent to further some object or purpose of the conspiracy. A common purpose and plan need not be proved by direct evidence but may be inferred from a development and collocation of circumstances. *Glasser v. United States, supra.* Once the existence of the conspiracy and the defendant's participation therein is shown by independent evidence, statements of co-conspirators, even though hearsay in nature, are admissible. *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). In this case, aside from the hearsay statements of Heimbecker, there is no evidence that shows that Schoenhut joined the illegal conspiracy. There is evidence that Schoenhut did certain things which furthered the in-

**482**

terests of the conspiracy. Schoenhut met with Pierce and Heimbecker after visiting the site to determine the amount of money needed to finance the project (N.T. 75). The government also introduced into evidence a letter from Schoenhut to Heimbecker which discussed the feasibility of the project (Government's Exhibit # 8). And, of course, the fact that defendant accepted stock in Greenmeadow Holding Company is incontrovertible. However, before one can be held to have joined a conspiracy he must *knowingly* contribute his efforts in furtherance of it. *Nassif v. United States,* 370 F.2d 147, 152 (8th Cir. 1966). One who furnishes supplies to an illicit conspiracy is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the buyer was a party but of which the supplier had no knowledge. *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). All of the acts which the government contends place Schoenhut into the conspiracy were completely innocent acts which fail to show that Schoenhut willfully participated in any unlawful plan. Therefore, the jury should not have been permitted to consider the hearsay declarations of Heimbecker which I have referred to above, and for the purposes of the pending motions, I will not consider hearsay statements made by Mr. Heimbecker to be competent evidence.

 The facts that defendant met with Pierce and Heimbecker to work out the details of the financing and construction, that he visited the site twice after receiving the stock, that he advised Heimbecker on various aspects of the economics and financing of the venture and that he told Heimbecker he saw no reason why the financing could not be put through the warehouse lines are not in themselves criminal in nature. Unless Schoenhut knew that the Delaware Valley conspirators planned to conceal the true identity of the principals of Greenmeadow from Delaware Valley, his assistance to them was perfectly innocent. The acts which the government claims proves defendant's involvement in a conspiracy are not illegal acts. Excepting all these facts there remains no evidence that the defendant did anything to attempt to procure a loan from Central Penn or to insure that Central Penn would in no way interfere with Karlee gaining a loan from Delaware Valley. Nor is there any proof that a loan was secured from Central Penn National Bank. Therefore, considering all the evidence in a light most favorable to the government, I have reached the inescapable conclusion that the government has failed to introduce into evidence any testimony upon which a jury could make the determination that the loan referred to in Count I of the indictment came from Central Penn National Bank. Since one of the essential elements of the offense charged in Count I is that the defendant procure or endeavor to procure a loan from Central Penn National Bank and since the government has not produced evidence to indicate that the loan came from Central Penn, I must grant defendant's motion for judgment of acquittal as to Count I of the indictment.

## COUNT III

 The defendant is charged in Count III as follows:

"From on or about July 19, 1973 and continuing to on or about July 19, 1974, at Philadelphia, in the Eastern District of Pennsylvania, William F. Schoenhut, Jr., then being Assistant Vice President of Central Penn National Bank, a bank the deposits of which are insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply monies, funds and credits of said bank, in that said William F. Schoenhut, Jr. authorized, and caused to be granted, a construction loan, and in extension of credit, in the approximate amount of $1,495,400, through the warehousing account of Delaware Valley Mortgage and Realty Corporation at Central Penn National Bank, to Karlee Corporation, a company in which William F. Schoenhut, Jr. was a director and a company in which William F. Schoenhut, Jr. was a stockholder, in that all of the stock of Karlee Corporation was owned by Greenmeadow Hold-

ing Company, a company in which William F. Schoenhut, Jr. held approximately 20% of the outstanding stock, said loan was authorized and supervised by William F. Schoenhut, Jr. without his revealing to Central Penn National Bank his own interest in Karlee Corporation and Greenmeadow Holding Company; and in that, William F. Schoenhut, Jr., authorized, and caused to be granted, the above loan, well knowing that certain documents supplied to Central Penn National Bank by Karlee Corporation, in connection with said loan, were forged and contained materially false statements and information. In violation of Title 18, United States Code, § 656."

Title 18 U.S.C. § 656 reads as follows: "§ 656. Theft, embezzlement, or misapplication by bank officer or employee

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, directcr, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100 he shall be fined not more than $1,000 or imprisoned not more than one year, or both . . . ."

To sustain a conviction of willful misapplication of bank funds under 18 U.S.C. § 656, it must be proved that (1) the defendant was an officer of (2) a federally connected bank, (3) that he willfully misapplied funds at a bank, and (4) that he made the misapplication with the intent to injure and defraud the bank. *United States v. Schmidt,* 471 F.2d 385 (3d Cir. 1972). It is not disput-

ed that the defendant was an officer of a federally connected bank. I have already determined above that there was not presented to the jury substantial evidence that the loan in question emanates from Central Penn National Bank. It follows therefrom that defendant could not be convicted of authorizing or causing to be granted a construction loan and an extension of credit through the warehousing account of Delaware Valley Mortgage and Realty Corporation at Central Penn National Bank to Karlee Corporation.

Once again the government contends that there is sufficient evidence to convict the defendant of Count III, that evidence consisting of defendant's efforts to secure funds from Central Penn for an enterprise in which he had an interest (Page 19, Government's Memorandum Contra Motions for Judgment of Acquittal, Arrest of Judgment and New Trial). However, as already discussed there is no evidence that the funds came from Central Penn within the meaning of the statute. I reiterate that it is possible that there could be a similar situation in which an officer of the lending institution which grants the extension of credit to a mortgage and realty company, which in turn grants a construction loan to another corporation, where the original lending institution retained enough control over the eventual use of the funds so that officers of that original lending institution would not be permitted to get involved in the approval of the extension of credit if they had any connection with a builder who was getting funds from the mortgage company. In the instant matter, however, the government has not submitted to the jury substantial evidence to show that Central Penn retained enough control over these funds so that officers of Central Penn might be able to approve or disapprove loans which are made by its borrower, in this case Delaware Valley Mortgage and Realty Corporation. Although Delaware Valley submitted mortgages to Central Penn as security for the warehouse line, there is no evidence that Central Penn could influence Delaware Valley as to

whom it granted its loans. Nor was there ever any evidence produced that Mr. Schoenhut had anything to do with Central Penn's original granting of the extension of credit of $500,000 on the warehouse line to Delaware Valley or that the defendant was responsible in any way for the further extensions of credit to Delaware Valley. There was testimony to the effect that the defendant did not have the authority by himself to grant any such extension of credit in the amount of $500,000. All the defendant could do would be to present such request to Central Penn's loan committee (N.T. 3–72). In fact Mr. Jacobsen testified at trial that it was he who made the initial presentation to grant Delaware Valley an extension of credit for the first $500,000 (N.T. 3–71). Mr. Jacobsen further testified that during the spring of 1973 when the warehouse line was extended from one to two million dollars, he was the one to whom the request was made (N.T. 3–78).

Count III also states that the defendant knew that certain documents supplied to Central Penn National Bank by Karlee in connection with their loan were forged and contained materially false statements and information. As previously discussed under Count I there is no evidence that the defendant was aware of these false signatures. Even the government states in its memorandum "it is admitted that there is no direct evidence that defendant knew of the forgeries committed by Laut and Li-Trenta at the direction of Inverso and Nirenberg." (Page 20). The government contends, however, that "a defendant may be convicted of a substantive offense which he did not personally commit if it is clear that the offense was committed in furtherance of a conspiracy of which he was a member." (Page 20). As was previously discussed there was not sufficient evidence aside from the hearsay statements of Mr. Heimbecker that defendant in fact joined the conspiracy. Therefore, the knowledge of the admitted conspirators that certain documents contained false information cannot be imputed to Schoenhut. For the above reasons, I must grant defendant's motion for a judgment of acquittal as to Count III of the indictment.

## COUNTS VI and VIII

Counts VI and VIII allege violations of 18 U.S.C. § 1005, which reads as follows:

"§ 1005. Bank entries, reports and transactions

Whoever, being an officer, director, agent or employee of any Federal Reserve bank, member bank, national bank or insured bank, without authority from the directors of such bank, issues or puts in circulation any notes of such bank; or

Whoever, without such authority, makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree; or

Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

Count VI reads as follows:

"On or about July 19, 1973 at Philadelphia, in the Eastern District of Pennsylvania, William F. Schoenhut, Jr. then being Assistant Vice President of Central Penn National Bank, a bank the deposits of which are insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully, and with intent to defraud said bank, make and caused to be made a materially false report, statement, and entry into the books of said bank, in that William F. Schoenhut, Jr., authorized and caused to be granted a construction loan and an extension of

credit, through the warehousing account of Delaware Valley Mortgage and Realty Corporation at Central Penn National Bank, to Karlee Corporation, well knowing that certain documents, including the construction loan agreement, submitted to Central Penn National Bank in connection with said loan and extension of credit, were forged, and fraudulently made, however, notwithstanding this, William F. Schoenhut, Jr. accepted these documents on behalf of said bank and authorized said loan. In violation of Title 18, United States Code, §§ 1005 and 2."

I have already determined that the government failed to submit substantial evidence to prove that there was in fact a loan from Central Penn to Karlee. I have also already determined that the government failed to submit substantial evidence to prove that defendant Schoenhut was aware of forged documents in connection with the construction loan between Delaware Valley and Central Penn. Finally, I have heretofore determined that there was not substantial evidence presented to the jury upon which it could make a determination that Schoenhut joined a conspiracy formed by Pierce, Inverso, Nirenberg and Heimbecker. For these reasons I must also determine that the government has not submitted substantial evidence to prove the material allegations of Count VI beyond a reasonable doubt. Accordingly, I will grant defendant's motion for judgment of acquittal as to Count VI.

Count VIII reads as follows:

"On or about November 23, 1973, at Philadelphia in the Eastern District of Pennsylvania, William F. Schoenhut, Jr., then being Assistant Vice President of Central Penn National Bank, a bank the deposits of which are insured by the Federal Deposit Insurance Corporation, did knowingly and unlawfully, with intent to defraud said bank, make a materially false report, statement and entry into the books of said bank, in that William F. Schoenhut, Jr., in his capacity as Assistant Vice President of Central Penn National Bank, supplied false information to said bank in a questionnaire supplied him by said bank, to wit: Schoenhut stated that he had no interest, financial or otherwise, in any company which borrowed money or was a customer of said bank, well knowing this statement to be untrue; Schoenhut further stated that he had not received any commissions, fees, etc. from any source other than said bank in connection with any transaction to which said bank was a party, within the past year, well knowing this statement to be untrue; Schoenhut further stated that he had not acquired any stock or securities which were available to him only by reason of his employment with said bank, during the past year, well knowing this statement to be untrue. In violation of Title 18, United States Code, § 1005."

Once again, I believe that my decision concerning Count I is controlling here. I will not repeat again but will recall the testimony of Mr. Jacobsen and Mr. Sommerville wherein each stated that construction loan agreements on the warehouse line were matters between Delaware Valley and its borrowers. Central Penn was not a party to those agreements. Even the admitted conspirators agreed to this. Nirenberg testified:

"Q The construction agreement that we have been discussing here today and that you have been asked about on direct examination was an agreement between what two parties?

A Karlee Corporation and Delaware Valley Mortgage and Realty Corporation.

Q As far as you know, was Central Penn even mentioned in that agreement?

A Without reading it right now, not to my knowledge, sir.

Q And the lender was Delaware Valley, is that correct, sir?

A Yes, sir.

Q The broker was Karlee?

A Yes, sir.

Q And that the funds to Karlee had to come from Delaware Valley?

A Yes, sir.

Q And there was a relationship between Karlee and Delaware Valley, wasn't there?

A Yes, sir.

Q But there was no relationship between Karlee and Central Penn, was there?

A No, sir."

(N.T. 2.87, 2.88)

Pierce testified similarly:

"Q Right. And now, sir, who were the parties to that construction loan agreement?

A Who were the parties to the construction loan? I believe it was Delaware Valley.

Q Delaware Valley?

A Yes.

Q Who was the other party?

A Karlee Corporation.

Q Now, there was nothing in that construction loan agreement that pertained to Central Penn, was there?

A I didn't see anything, no."

(N.T. 2.5)

I have personally examined government Exhibit # 6, the construction loan agreement between Delaware Valley and Karlee, and have found no reference to Central Penn. Therefore, I will also grant defendant's motion for judgment of acquittal as to Count VIII of the indictment.

COUNT IX

██ This is the conspiracy count. I have already granted defendant's motions for judgment of acquittal as to each of the substantive counts and I have previously decided that the government has not presented substantial evidence to prove that defendant Schoenhut joined the illegal conspiracy formed by Pierce, Inverso, Nirenberg and Heimbecker. Therefore, defendant's motion for judgment of acquittal as to Count IX will also be granted.

In sum, an order will be entered today granting defendant's motion for judgment of acquittal as to all Counts of the indictment under which he was charged, those Counts being numbers I, III, VI, VIII and IX.