PEOPLE v EDWARD VILLARREAL

PEOPLE v ALFREDO VILLARREAL

PEOPLE v FUSON

Docket Nos. 78-1517, 78-1521, 78-1855. Submitted January 7, 1980, at Detroit.—Decided October 6, 1980. Leave to appeal applied for.

Alfredo Villarreal and Edward Villarreal were convicted of conspiracy to deliver heroin, Alfredo Villarreal was also convicted of delivery of heroin and Michael Fuson was convicted of conspiracy to deliver heroin and delivery of heroin, all in Recorder's Court of Detroit, Harvey F. Tennen, J. The defendants were tried along with five others, all represented by the same attorney. At the preliminary examination, as well as during trial, the prosecutor raised the problem of a conflict of interest since one attorney was representing multiple defendants. The court, following the opening statements by the prosecution and defense, indicated that, while at that stage of the proceeding it was not aware of a conflict of interest, such a conflict could arise later in the trial. Notwithstanding any conflict of interests that might arise during the course of the trial, all defendants indicated they wanted to keep the same attorney.

Defendants appeal, alleging that they did not knowingly and voluntarily waive their right to the assistance of an attorney unhindered by a conflict of interest and the multiple representation resulted in prejudice to them. *Held:*

1. The trial court had an affirmative duty to explore the risks of multiple representation and to give particular examples of where conflicts might arise, as well as advising defendants of the alternatives regarding separate counsel, in questioning defendants regarding their waiver of conflict of interest claims

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 21 Am Jur 2d, Criminal Law § 319.

Circumstances giving rise to conflict of interest between or among criminal codefendants precluding representation by same counsel. 34 ALR3d 470.

[2, 3] 21 Am Jur 2d, Criminal Law § 315.

in keeping their attorney. Here, defendants' waiver was not valid, since the court failed to so advise the defendants.

2. In order to find that ineffective assistance of counsel resulted from shared counsel by codefendants, actual prejudice must be shown. Multiple representation can particularly involve effective assistance of counsel in conspiracy cases where liberal rules of evidence and the wide latitude accorded the prosecution may operate harshly on a defendant. The court must also consider whether the defendants lost the benefit of arguments stressing the codefendants' links to specific evidence or the evidence in general as greater than defendant's and whether the cross-examination of an eyewitness may be inhibited by conflicting loyalties. The defendants were prejudiced by the multiple representation.

3. The prosecutor's appeal to the civic duty and social fears of the jurors did not constitute reversible error in view of the cautionary instruction given by the trial judge.

4. There was no entrapment under the objective test contrary to the assertion of defendant Alfredo Villarreal.

Reversed and remanded.

1. CRIMINAL LAW — TRIAL COURTS — MULTIPLE REPRESENTATION.

A trial court has an affirmative duty to explore the risks of multiple representation and to give particular examples of where conflicts might arise, as well as advising defendants of the alternatives regarding separate counsel, in instances where two or more criminal defendants are represented by the same attorney at trial.

2. ATTORNEY AND CLIENT — MULTIPLE REPRESENTATION — ACTUAL PREJUDICE.

Actual prejudice must be shown before finding reversal warranted in cases where ineffective assistance of counsel resulting from shared counsel by codefendants is claimed.

3. ATTORNEY AND CLIENT — MULTIPLE REPRESENTATION — PREJUDICE — FACTORS.

Factors to be considered in determining prejudice by multiple representation are: (1) whether the case is a conspiracy case where liberal rules of evidence and the wide latitude accorded the prosecution may operate harshly on a defendant; (2) whether the defendants lost the benefit of arguments stressing the codefendants' link to specific evidence or the evidence in general as greater than defendant's; and (3) whether the cross-examination of an eyewitness may be inhibited by conflicting loyalties.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Robert Sheiko,* Assistant Prosecuting Attorney, for the people.

*Ronald A. Molter,* for defendants Villarreal on appeal.

*Alvin C. Sallen,* for defendant Fuson on appeal.

Before: R. M. MAHER, P.J., and M. F. CAVANAGH and CYNAR, JJ.

CYNAR, J. Defendants Alfredo Villarreal and Edward Villarreal were convicted by a jury of conspiracy to deliver heroin, MCL 750.157a; MSA 28.354(1), and MCL 335.341(1)(a); MSA 18.1070(41)(1)(a). Defendant Alfredo Villarreal was also convicted of one count of delivery of heroin, MCL 335.341(1)(a); MSA 18.1070(41)(1)(a).

Trial was held in Detroit Recorder's Court, commencing February 6, 1978. On March 2, 1978, defendant Alfredo Villarreal was sentenced to two terms of from 8 to 20 years imprisonment, the sentences to run concurrently. On the same date, the trial judge sentenced defendant Edward Villarreal to 8 to 20 years imprisonment. Both defendants appeal as of right.

Defendant Michael Fuson was convicted by the same jury of one count of conspiracy to deliver heroin, MCL 750.157a; MSA 28.354(1), and MCL 335.341(1)(a); MSA 18.1070(41)(1)(a), and two counts of delivery of heroin, MCL 335.341(1)(a); MSA 18.1070(41)(1)(a). On March 2, 1978, defendant was sentenced to three terms of from 3 to 20 years imprisonment, said sentences to run concurrently. He appeals as of right.

Defendants were tried along with Samuel Mendez, Arthur Sosa, Edmundo Rodriquez, Jack Sirhan, and Phillip Hayes; all of the defendants

were charged with conspiracy and all defendants were represented by attorney John D. O'Connell.

At the preliminary examination, as well as during trial, the prosecutor raised the problem of a conflict of interest since attorney John D. O'Connell was representing multiple defendants.

During the preliminary examination, following cross-examination by attorney John D. O'Connell, the prosecutor suggested that the court should inquire of the defendants individually whether they understood that there definitely could be a conflict of interest and whether they were waiving any claim of conflict of interest because of multiple representation of defendants by attorney O'Connell. Attorney O'Connell, who was a veteran of the trial court arena, indicated several times a lack of knowledge as to what problems could arise in multiple representation. After further expression of concern by the court and the prosecutor, each defendant answered the inquiry of the court by stating he was satisfied with John D. O'Connell as his lawyer.

At trial, after the opening statement of defense counsel, which immediately followed the people's opening statement, the prosecuting attorney again raised the problem of possible conflicts of interest by asking the court to make further inquiry of defendants. The court indicated that, while at that stage of the proceeding it was not aware of a conflict of interest, such a conflict could arise later in the trial. Notwithstanding any conflict of interest that might arise during the course of the trial, all defendants indicated they wanted Mr. O'Connell as their attorney.

Numerous witnesses testified at trial. The prosecutor's theory was that the alleged conspiracy was run by defendant Mendez out of the Golf King Recreation Center in Detroit.

Kay Lahman, a Detroit police officer, testified that on October 28, 1976, she went to the Golf King Recreation Center in Detroit where she met Gary Stewart and saw defendants Mendez and Sosa. She purchased a package of what she believed to be heroin from Gary Stewart. She had seen defendant Sosa give the package to Stewart. Defendant Mendez walked a few feet away just prior to the transaction. On November 10, 1976, Officer Lahman purchased narcotics from defendants Fuson and Alfredo Villarreal at the recreation center. When she inquired about a larger purchase, Fuson told her that he would take her to "Sammy" the next time she came by. Fuson referred to Villarreal as his partner. Officer Lahman testified that on November 23, 1976, she went to the Golf King Recreation Center and met defendant Fuson, from whom she bought narcotics after they left the center and went to 2060 Clarkdale. She testified that on December 1, 1976, she purchased narcotics from Edmundo Rodriquez (not present at trial) at the Golf King Recreation Center. Officer Lahman testified that on December 8, 1976, she met Edmundo Rodriquez at Golf King and subsequently purchased narcotics from him in front of 2129 Vinewood.

Dennis Paul Barton, a Detroit police officer, accompanied Officer Lahman during most of the transactions reviewed above and corroborated her testimony.

Police Officer Richard Graves testified that on February 21, 1977, he went to the Golf King Recreation Center with informant James Popalia, where they met defendant Ramiro Pena. Defendant Pena and Popalia walked into the men's room together and then Popalia came out alone, handing Officer Graves two packs of suspected

heroin. Graves gave him $100 in police funds with which he returned to the men's room. Popalia and defendant Pena then exited from the men's room at the same time. Graves testified that on March 1, 1977, he went to the Golf King Center where he met with defendant Pena and arranged a subsequent heroin purchase from defendant Sirhan, which purchase took place in front of 2103 Clarkdale.

Informant James Popalia testified that on February 21, 1977, he went with Officer Richard Graves to the Golf King Recreation Center where he purchased heroin from defendant Pena. On March 1, 1977, Popalia and Officer Graves went to the recreation center where they met Jack Sirhan and subsequently purchased suspected narcotics from him at the corner of Clarkdale and Toledo. Popalia testified that between October, 1976, and November, 1977, he went with Jack Sirhan, Ramiro Pena, and others to Kopernic Street for the purpose of picking up narcotics that were to be distributed at the Golf King Recreation Center.

Gary Stewart testified that his brother owned the Golf King Recreation Center and that he worked there on a part-time basis. Stewart testified that he contacted the police regarding a drug trafficking organization at that location which to his knowledge was run by Samuel Mendez. Stewart testified that on October 25, 1976, he went to Golf King with Officer Kay Lahman to purchase narcotics. He talked with defendant Samuel Mendez at that time who agreed to sell to him. In the presence of Officer Lahman he paid defendant Samuel Mendez and obtained the suspected narcotics from defendant Art Sosa. In December, 1976, Stewart began working for Samuel Mendez in the drug organization. His duties were to keep an eye

on things when Mendez was not there, to collect money from the individuals selling drugs in and around the pool room, and to turn the money over to Mendez when he came in. Stewart testified that other persons working for Mendez at the time were defendant Jack Sirhan, defendant Phillip Hayes, defendant Freddy Villarreal, defendant Ramiro Pena, defendant Michael Fuson, defendant Art Sosa, and defendant Eddie Villarreal. Stewart then outlined the various duties and operations within the organization, as well as specific incidents of narcotics transactions that he had witnessed. He testified that defendant Alfredo Villarreal sold drugs for the organization and that defendant Edward Villarreal ran the cutting and distribution house.

Police Officers Michael Zamieski, Arthur Carrier, Stephen Ramsey, Steven Gyure, and William Stander testified regarding their handling of the narcotics evidence in this case. Police chemists Joseph Peindl, Richard Kasprzyk, and Raymond Feul testified concerning the chemical analysis of the narcotics evidence. Police Inspector Francis Allen and police accountant Gerald Honsberger testified regarding the destruction of certain narcotics evidence.

At that point the prosecution rested.

Defense witness Gilbert Hinojosa testified regarding the use and sales of narcotics by witness Gary Stewart.

Defense witness Juanita Carrizalez testified that she obtained narcotics at the Golf King Recreation Center from defendant Michael Fuson by paying witness Gary Stewart.

Lori Villaneuva testified that she had purchased narcotics at the recreation center from Gary Stewart and had witnessed other people come to see

him regarding narcotics purchases. On cross-examination, witness Villaneuva testified that she had also seen defendant Mike Fuson, defendant Jack Sirhan, and Ramiro Pena sell narcotics at Golf King.

Defendant Phillip Hayes testified that he had never sold or delivered narcotics, that he never had any dealings in narcotics with Gary Stewart, and that he had never known Sam Mendez to have anything to do with narcotics.

Defendant Jack Sirhan testified that he had sold narcotics which he received from Gary Stewart. He testified that he had never known Sam Mendez to have anything to do with narcotics and that witness Stewart had instructed him to say that it was "Sammy's stuff" if he ever got caught with the narcotics.

Defendant Samuel Mendez testified that he used to play pool at the Golf King Recreation Center. He testified that he had had arguments with witness Gary Stewart concerning pool games. He testified that he has never used or sold narcotics.

In his closing argument, defense counsel attacked the credibility of witness Stewart. He stated that there was no evidence against Phillip Hayes, Samuel Mendez, or Eddie Villarreal apart from the testimony of Gary Stewart.

*Did the defendants knowingly and voluntarily waive their right to the assistance of an attorney unhindered by a conflict of interests, when the multiple representation of them at trial resulted in prejudice to the defendants?*

In *People v Bentley,* 402 Mich 121; 261 NW2d 716 (1978), the Court noted that despite the fact that the trial judge had been made aware of the potential prejudice involved in joint representation, the judge made no attempt to determine

whether the defendant was personally aware of the potential prejudice but nonetheless chose to waive his right to separate counsel. The Court concluded that the denial of the right to effective assistance of counsel was so offensive to the maintenance of a sound judicial process that it could not be considered as harmless error. The Court's holding was predicated on the absence of a voluntary and informed waiver of the right to separate counsel. This would indicate that, in some cases, a waiver will be recognized as valid.

Whether the defendants made a valid waiver hinges on the extent of the trial judge's duty to explain the matter to the defendants prior to taking the waiver. Michigan case law does not specify exactly what must be reviewed with a defendant before a valid waiver can be established. A number of Federal cases impose a duty on the court to explain and explore possible conflicts with the defendants, since absent such discussion the defendants may not be aware of the type and magnitude of the problems involved in multiple representation. For example, *United States v Donahue,* 560 F2d 1039 (CA 1, 1977) cites *United States v Foster,* 469 F2d 1, 4-5 (CA 1, 1972), as properly outlining the trial court's duty:

"[W]here trial commences after the publication date of this opinion, it shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or if qualified, may have such counsel appointed by the court and paid for by the government."

In *Donahue,* as in the instant case, the defendant

was informed that there was no conflict of interest at that time but that one might develop later on, and the defendant was asked whether he wished to continue with his present attorney. The defendant in *Donahue,* as in the instant case, answered affirmatively. The court in *Donahue* held that the trial court had failed to adequately advise the defendant regarding joint representation, citing the failure to advise the defendant of his right to separate and, if appropriate, appointed counsel. The court then went on to outline the type of explanation that could be given a defendant, even prior to trial, when specific conflicts had not yet come to light:

"The court, prior to trial, should have pointed out that for each to be represented by essentially the same lawyers meant that each was foregoing his right to representation by a lawyer whose exclusive loyalty would be to him alone. The court should have advised that it was possible with respect to particular defenses and particular decisions—such as whether or not to take the stand, or to call particular witnesses, or to ask particular questions on cross-examination—that what was in one defendant's best interest would turn out not to be in the other's. Therefore, where the same lawyer or lawyers represented both defendants, counsel might be hampered in carrying out their duties to one client by their duties to the other. The court might also have asked whether the defendants had explored these matters with counsel; and, if necessary, have directed counsel to go over the possible disadvantages of joint representation with their clients, after which the court should have made it a matter of record, after speaking directly to each defendant, that defendant felt he understood the potential dangers of joint representation and still wished to proceed.

"Without purporting to prescribe any particular form of words, we emphasize that under *Foster,* the court must explain and explore the risks of joint representation." *United States v Donahue, supra,* 1043-1044.

Other Federal cases imposing or discussing similar duties of explanation regarding multiple representation on the trial court are *United States v Dolan,* 570 F2d 1177, 1180-1181 (CA 3, 1978), *United States v Garcia,* 517 F2d 272, 278 (CA 5, 1975), *United States v Lawriw,* 568 F2d 98, 104-105 (CA 8, 1977). The United States Supreme Court has yet to resolve these issues. See *Holloway v Arkansas,* 435 US 475, 483-484; 98 S Ct 1173; 55 L Ed 2d 426 (1978).

The trial court's assertion in this instance that a conflict of interest might arise while the trial progressed and an expression by the defendants that they were satisfied with counsel would not conform with an affirmative duty to explain the risks of multiple representation to the defendants. The trial court had an affirmative duty to explore the risks of multiple representation and to give particular examples of where conflicts might arise, as well as advising defendants of the alternatives regarding separate counsel, as set forth in *United States v Donahue, supra.*

We determine there was an absence of a valid waiver in this area. However, it must be determined whether multiple representation resulted in ineffective assistance of counsel. In order for ineffective assistance of counsel to result from shared counsel by codefendants, there must be a showing of actual prejudice:

"Specifically, a defendant is entitled to 'the undivided loyalty of his counsel'. *People v Gardner,* 385 Mich 392, 400; 189 NW2d 229, 234 (1971).

"Where counsel have represented codefendants, we have required a showing of actual prejudice before finding reversal warranted. *People v Jones,* 64 Mich App 659, 667-668; 236 NW2d 531, 536 (1975), *People v Osborn,* 63 Mich App 719, 724; 234 NW2d 767, 770

(1975), *People v Marshall,* 53 Mich App 181, 189-190; 218 NW2d 847, 852 (1974); *People v Hilton,* 26 Mich App 274, 276; 182 NW2d 29, 30 (1970). This is because such relationships do not inevitably involve conflicts of interests. *People v Hilton, supra." People v Van Brocklin,* 76 Mich App 427, 430; 257 NW2d 107 (1977).

See also *Holloway v Arkansas,* 435 US 475, 482; 98 S Ct 1173; 55 L Ed 2d 426 (1978).

In *Glasser v United States,* 315 US 60, 76; 62 S Ct 457; 86 L Ed 680 (1942), the Court acknowledged that multiple representation can particularly involve effective assistance of counsel in conspiracy cases where liberal rules of evidence and the wide latitude accorded the prosecution may operate harshly on a defendant. The fact that the charge in this case was one of conspiracy, then, is one factor to be considered by this Court in determining whether prejudice resulted from the multiple representation.

Another factor in determining whether the defendants were prejudiced by the multiple representation was whether the defendants lost the benefit of arguments stressing the codefendants' links to specific evidence, or the evidence in general, as greater than defendant's. See *People v Bentley, supra.* Another indication of prejudice exists when the cross-examination of an eyewitness may be inhibited by conflicting loyalties. *People v Bentley, supra.* In *People v Gardner,* 406 Mich 369; 279 NW2d 785 (1979), the Court ruled that prejudice is shown, even when the defenses are not necessarily inconsistent, when it is apparent that the testimony will portray differing degrees of culpability between the defendants, requiring counsel to draw a line of demarcation as to the relative culpability of his two clients.

Following the criteria reviewed above and apply-

ing it to the matter before us, it is our opinion that the defendants were prejudiced by the multiple representation in this case.

It should be noted that there was a coordinated defense strategy presented in this case. Witness Gary Stewart provided critical testimony connecting individual purchases into a specialized drug distribution organization run by defendant Mendez. The consistent defense strategy present in the case was to impeach and discredit the critical testimony of Gary Stewart. This was done by impeaching his testimony with inconsistent preliminary examination testimony regarding his drug overdose, by introducing a series of defense witnesses who testified that Stewart was operating the drug sales out of the Golf King Recreation Center and that Stewart had a motive to blame the sales on Mendez both because Mendez had humiliated him in a pool game and because Stewart was cooperating with the police in order to get charges against him dismissed.

Such defense strategy may have ignored defendant Fuson's interests in some aspects. The testimony indicated that Fuson was a lesser figure in the organization, yet no argument was made regarding Fuson's lesser culpability as a distant link in the chain of evidence of conspiracy. Defense counsel called witness Juanita Carrizalez who testified on direct examination that she obtained narcotics from Fuson by paying Gary Stewart. While this may have been adverse to Stewart, it implicated Fuson in narcotics sales. Defense counsel's final argument did not refer to Fuson at all.

The defense of Alfredo Villarreal was much like that of defendant Fuson. Neither defendant Alfredo Villarreal nor the delivery charge against him were mentioned during closing argument.

Like defendant Fuson, defendant Alfredo Villarreal was implicated as a seller of drugs by a defense witness called to impeach Gary Stewart. We find this more than sufficient to establish the requisite prejudice.

While the answer to the question is a close one, we find that Edward Villarreal was also prejudiced by the multiple representation. The coordinated defense strategy tended to benefit the higher echelon people in the alleged organization who were implicated only by the testimony of Gary Stewart. Defendant Edward Villarreal is much like defendant Mendez in this respect, although not alleged to be on the same echelon as Mendez. Mendez was not prejudiced by the representation received in this case. For instance, there was one noticeable difference between the defense of Mendez and that of Edward Villarreal. Defendants Phillip Hayes, Arthur Sosa, and Jack Sirhan were all asked whether they had ever known defendant Samuel Mendez to have anything to do with narcotics and all three replied negatively. No such question was asked regarding Edward Villarreal. For whatever reason, defense counsel often singled out questions regarding Mendez, thereby providing him with the strongest defense.

Defendants assert a claim of prosecutorial misconduct relating to that portion of plaintiff's closing argument as follows:

"But there are other rights. And they are the rights of the People of the State of Michigan and everyone in this room is the People of the State of Michigan, including the defendants. And their rights demand that the streets be safe. Their rights demand that you protect their rights. And you protect their rights by doing justice.

"And as I said before, it is just as important to convict the guilty as it is to free the innocent.

"And you can protect the rights of the People of the State of Michigan in this case by rendering a just verdict. You have heard the evidence. You can decide what happened."

Defense counsel objected to the prosecutor's remark and the trial court gave a curative instruction.

"The attorneys in their closing arguments may have alluded to the fact that there is a social problem and we are all citizens. That is true. But it is not part of your consideration. And I ask you to disregard any social problems which you may be curing by your deliberations. You are not here to do that. We have people you write to in Lansing and Washington and so on and so forth to make the—We are the judicial process. We are part of the judicial process. You are the jury and judges of the fact and those facts must be only as elicited in this courtroom from that witness stand."

Defendants argue that the comment made by the prosecutor was an improper "civic duty" argument, appealing to the emotions of the jurors and detracting from the evaluation of defendants' guilt or innocence.

The people argue that the remarks were a direct response to closing arguments made by defense counsel and, therefore, were not improper. The people also argue that any problem was corrected by the court's curative instruction.

In some cases, a prosecutor's appeal to the civic duty or social fears of the jurors has been held to be reversible error. For example, in *People v Biondo,* 76 Mich App 155, 159-160; 256 NW2d 60 (1977), *lv den* 402 Mich 835 (1977), this Court ruled that the prosecutor's attempt to cajole the jury

into believing that a guilty verdict would be a substantial act towards saving Detroit from financial ruin was prejudicial as not relevant to the guilt or innocence of the defendant, and, therefore, reversible error. See also *People v Gloria Williams,* 65 Mich App 753; 238 NW2d 186 (1975).

Even if this Court concludes that the prosecutor's reference was an improper attempt to appeal to the jurors' fears arising from the present crime problem, the remarks are very similar to the ones reviewed in *People v Hall,* 396 Mich 650; 242 NW2d 377 (1976), which the Court concluded did not create reversible error in view of the cautionary instruction given. We agree with the Court in *Hall,* and find the instruction here sufficient to cure the error.

Concerning the claim of erroneous instruction relating to conspiracy, the defendants failed to object to the instructions as given, thereby precluding appellate review in the absence of manifest injustice. *People v Dixon,* 84 Mich App 675; 270 NW2d 488 (1978), *lv den* 405 Mich 837 (1979). We find no manifest injustice present here.

Defendant Alfredo Villarreal argues that while there might have been sufficient evidence to connect him to *a* conspiracy to deliver heroin there was insufficient evidence to convict him of *the* heroin delivery conspiracy headed by defendant Mendez because there was no evidence connecting defendant Alfredo Villarreal with anyone other than defendant Fuson. Evidence that a defendant was aware that he was not plotting alone with common conspirators to violate the law was sufficient to raise the necessary inference that he had joined in an overall agreement. *Blumenthal v United States,* 332 US 539, 555, n 14; 68 S Ct 248; 92 L Ed 154 (1947).

Contrary to the assertion of defendant Alfredo Villarreal, relying on the reasoning in *People v Duke,* 87 Mich App 618; 274 NW2d 856 (1978), and *People v Roy,* 80 Mich App 714; 265 NW2d 20 (1978), *lv den* 402 Mich 903 (1978), we determine that there was no entrapment under the objective test, since police informers were only taking orders within a larger, preconceived criminal group or scheme.

At the end of the first day of trial, the judge was discussing certain administrative matters with the jury and preparing to dismiss them when some conversation was had between the court and a juror in open court, but unheard and unrecorded. The record reflects that the conversation was in the presence of the jurors, the defendants, and their attorney. No objection was made. Defendants argue that this conversation violated their right to be present at all stages of the proceedings. This right only extends to conferences or occurrences wherein defendants' substantial rights may be affected. *People v Bowman,* 36 Mich App 502, 510; 194 NW2d 36 (1971), *lv den* 386 Mich 783 (1972). There is no indication that any substantial rights of the defendants were affected. No objection was lodged nor was the issue raised in any other manner. Absent the raising of an objection, we will not presume that the matter affected defendants' substantial rights.

We reverse the defendants' convictions and remand the cause for further proceedings.